**ORIGINAL**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

SEP 23 1998

LUTHER D. THOMAS, Clerk
By: _____
Deputy Clerk

|  |  |
|---|---|
| VANESSA COLEY, individually and on behalf of NEVILLE R. COLEY, JR., a minor, and DERRICK S. COLEY, a minor, et al., ) ) ) ) ) | |
| Plaintiffs, ) ) | CIVIL ACTION NO. 98-CV-1945-ODE |
| v. ) ) | |
| HERCULES INCORPORATED, HERCULES CHEMICAL CORPORATION, GEORGIA-PACIFIC CORPORATION, ALLIEDSIGNAL, INC., and DAVID T. SMITH, JR., ) ) ) ) ) ) | |
| Defendants. ) | |

## DEFENDANT GEORGIA-PACIFIC CORPORATION'S OBJECTION TO THE AFFIDAVIT OF MARCO KALTOFEN, P.E. IN SUPPORT OF PLAINTIFFS' MOTION TO REMAND

Defendant Georgia-Pacific Corporation ("Georgia-Pacific") files this Objection to

the Affidavit of Marco Kaltofen, P.E. filed in Support of Plaintiffs' Motion to Remand.

### PRELIMINARY STATEMENT

Plaintiffs submit the Affidavit of Mr. Kaltofen, a purported expert, in an attempt

to rebut Defendants' arguments and the affidavits of Messrs. Royer, Smith and Wileman,

which establish the lack of any factual basis for Plaintiffs having joined Georgia-Pacific

as a defendant in this action. As discussed below, Mr. Kaltofen's affidavit is entirely

inadmissible.

First, Mr. Kaltofen is wholly unqualified to provide any expert testimony. Mr. Kaltofen claims to have a "Bachelor of Science degree in General Engineering and Chemistry from Boston University". A recent deposition of Mr. Kaltofen in another matter, however, shows this is at best misleading -- Mr. Kaltofen admittedly does not have a degree in chemistry. Second, as a "general engineer," Mr. Kaltofen is not qualified under Fed. R. Civ. P. 702 to render opinions on the operations and processes of pulp mills. Because Mr. Kaltofen is unqualified to render the opinions in his affidavit, it is inadmissible.

Third, Mr. Kaltofen bases his affidavit entirely on hearsay and other inadmissible evidence, such as unrelated studies and an internet database. This testimony does not meet the Supreme Court's standards for admission of expert testimony mandated in *Daubert v. Merrell Dow Pharmaceuticals.* Fourth, Mr. Kaltofen's affidavit does not "fit" the issues in this case; his opinions only generally and vaguely relate to unidentified pulp mills that he claims discharged or sent certain types of waste off-site. On that basis, Mr. Kaltofen assumes Georgia-Pacific's Brunswick pulp mill also did so. Mr. Kaltofen does not rely on data or studies from the pulp mill at issue in this case, or from any Plaintiffs' persons or properties. As such, Mr. Kaltofen's methodologies are wholly inadequate and cannot meet the reliability standards for expert testimony.

Finally, Mr. Kaltofen lacks the necessary objectivity and credibility required of an expert. Mr. Kaltofen is an "activist" who spends most of his time instigating lawsuits against large corporations. He has prepared an "Ecosleuthing" manual that advocates trespass and attempts to raise concerns from such things as "bath[ing] in electromagnetic

radiation from your toaster" to "nerve gas in your cockroach spray [that] may be making your kids nuts". Such a witness should not be permitted to offer expert testimony on any subject before this Court.

As shown below, the Kaltofen Affidavit should be disregarded as inadmissible, baseless and improper "expert" testimony.

## INTRODUCTION

Defendants timely removed this action from the State Court of Fulton County, based on federal question jurisdiction, the All Writs Act, supplemental jurisdiction, and diversity jurisdiction. Diversity jurisdiction exists because Plaintiffs fraudulently joined as defendants two Georgia residents, including Georgia-Pacific. The Complaint's sole allegation of wrongdoing by Georgia-Pacific is that it "contributed to the releases" of hazardous waste by Hercules "by sending its hazardous waste to Hercules for processing and discharge." Complaint ¶11.

On August 8, 1998, Plaintiffs moved to remand this action to state court, and on August 20, 1998, Georgia-Pacific filed its Opposition to Plaintiffs' Motion to Remand. In support of its opposition, Georgia-Pacific submitted affidavits from Steven Royer ("Royer Aff.") and Jonathan Smith ("Smith Aff."), both of whom testified that Georgia-Pacific never sent any hazardous waste to Hercules for processing, discharge or any other purpose. Royer Aff. ¶¶ 3, 14-17; Smith Aff. ¶¶ 2-5. In addition, Hercules submitted the Affidavit of Kevin Wileman ("Wileman Aff."), who confirmed that Hercules never received any hazardous waste from Georgia-Pacific for processing, discharge or any other purpose. Wileman Aff. ¶¶ 3, 4.

-3-

On September 8, 1998, Plaintiffs filed their Reply Brief in Support of Motion to Remand, and submitted, *inter alia*, the affidavit of Marco Kaltofen, P.E. ("Kaltofen Aff.") in support of two arguments that they did not fraudulently join Georgia-Pacific. First, Plaintiffs claim that the general allegations of wrongdoing by "Defendants" apply to Georgia-Pacific, notwithstanding the express allegation that "Hercules' Brunswick facility was the principal source of the releases of hazardous waste into the environment and the resulting soil, water and air contamination of Plaintiffs' property. [Georgia-Pacific] contributed to the releases by sending its hazardous waste to Hercules for processing and discharge." Complaint ¶ 11.

Second, Plaintiffs argue that the only specific allegation concerning Georgia-Pacific -- that it sent its hazardous waste to Hercules for processing and discharge -- must be true because Hercules at some point in time burned black liquor from an unspecified pulp mill as fuel. Plaintiffs' Reply Brief at 22. Plaintiffs insist that Georgia-Pacific must be the source of that black liquor because "Georgia-Pacific Corporation's Brunswick pulp and paper mill is the only pulp and paper mill in the vicinity of Hercules' plant." *Id.*

Plaintiffs' arguments fail, however, because both of the affidavits submitted in support of those arguments are inadmissible.[1] As discussed below, Mr. Kaltofen's lack of qualifications and objectivity, and his use of unreliable and unscientific methodologies, make the Kaltofen Affidavit inadmissible to support Plaintiffs' arguments or for any other purpose.

---

[1] The inadmissibility of Ms. Atwell's Affidavit is addressed in Georgia-Pacific's Objection to the Atwell Affidavit, which accompanies this submission.

-4-

## THE KALTOFEN AFFIDAVIT

Mr. Kaltofen claims to be a registered professional civil engineer with a

bachelor's degree in general engineering and chemistry. Kaltofen Aff. ¶ 2. Mr. Kaltofen

offers the following opinions:

1. "Chlorinated guaiacols (o-methoxyphenols) are components of chlorine-bleached kraft pulp and paper mill effluents and have been detected in receiving water and sediment adjacent to paper mills." Kaltofen Aff. ¶ 4. Mr. Kaltofen cites one piece of literature for this proposition; he does not provide a copy of it. Mr. Kaltofen neither provides nor relies on any test data concerning whether the Georgia-Pacific Brunswick pulp mill produces or ever released chlorinated guaiacols.

2. "Paper mills in the United States are known sources of waterborne polychlorinated biphenyls ('PCB')." Kaltofen Aff. ¶ 5. Mr. Kaltofen's support for this opinion is something called "the RTK NET's (the Right-To-Know Network)" that he got from the internet. Mr. Kaltofen neither provides nor relies on any test data concerning whether the Georgia-Pacific Brunswick pulp mill produces or ever released PCBs.

3. "Paper mills also generate polychlorinated dioxins and furans." Kaltofen Aff. ¶ 6. Mr. Kaltofen cites one piece of literature regarding dioxins, furans and PCBs in a lake from British Columbia for this proposition; he does not provide a copy of it. Mr. Kaltofen neither provides nor relies on any test data concerning whether the Georgia-Pacific Brunswick pulp mill produces or ever released dioxins or furans.

4. "The process which produces dioxins similarly produces some PCBs which are also discharged to the wastewater. Clearly It [sic] is both scientifically probable or even specifically documented that GP's kraft paper mill in Brunswick also discharges chlorinated organic wastes, including PCBs, Chlorinated guaiacols and Chlorinated Dibenzodioxins and Dibenzofurans." Kaltofen Aff. ¶ 6. Mr. Kaltofen cites no authority for this proposition. Mr. Kaltofen neither provides nor relies on any test data concerning whether the Georgia-Pacific Brunswick pulp mill produces or ever released chlorinated organic wastes.

5. "Georgia-Pacific's Brunswick plant generates waste containing mercury." Kaltofen Aff. at p. 3 (no paragraph designation). As support for this opinion, Mr. Kaltofen claims that Georgia-Pacific's Superintendent of Environmental Services admits this in an affidavit. Mr. Kaltofen neither provides nor relies

on any test data concerning whether the Georgia-Pacific Brunswick pulp mill produces or ever released mercury.

6.  "Within reasonable scientific probability, it is my opinion that Georgia-Pacific's Brunswick plant has emitted PCBs and mercury into the Turtle River." Kaltofen Aff. at p. 4 (no paragraph designation).  As support for this opinion, Mr. Kaltofen claims Georgia-Pacific's Bellingham, Washington pulp mill once reported mercury in its discharge.  He admits the Brunswick mill has never reported any mercury or PCBs.  Mr. Kaltofen neither cites any authority nor any data from or concerning the Georgia-Pacific Brunswick pulp mill for this proposition.

7.  Mr. Kaltofen refers to a "1998 Guidelines for Eating Fish from Georgia



refers to PCB and mercury in fish from the Turtle River.  Kaltofen Aff. at p. 4 (no paragraph designation).  Mr. Kaltofen offers no opinion concerning these "Guidelines".  Mr. Kaltofen does not claim that any conduct by Georgia-Pacific is responsible for these "Guidelines".

8.  Mr. Kaltofen cites a November 14, 1997 letter from a Hercules employee to the Georgia Environmental Protection Division, which, according to Mr. Kaltofen, discusses equipment that removes odorous sulfur compounds from crude sulfate turpentine.  Mr. Kaltofen does not provide a copy of this letter. According to Mr. Kaltofen, there also is a reference to pulp mill liquor in this letter. Kaltofen Aff. at pp. 4-5 (no paragraph designation).  Mr. Kaltofen thus concludes that "Within reasonable scientific probability, the 'pulp mill liquor' referred - to . . . is the same type of pulp mill liquor waste that is generated by Georgia-Pacific's Brunswick plant."

## ARGUMENT

### I. Procedure for Objecting to Affidavits.

In the United States District Court for the Northern District of Georgia, "the proper method for challenging the admissibility of evidence in an affidavit is to file a notice of objection to the challenged testimony." *Morgan v. Sears, Roebuck and Co.*, 700 F. Supp. 1574, 1576 (N.D. Ga. 1989) (Forrester, J.). *Accord Pinkerton and Laws Co., Inc. v. Roadway Express, Inc.*, 650 F. Supp. 1138, 1141 (N.D. Ga. 1986) (Ward, J.); *Smith v. Southeastern Stages, Inc.*, 479 F. Supp. 593, 594-95 (N.D. Ga. 1977) (O'Kelley, J.); and *Smith v. Ortho Pharmaceutical Corp.*, 770 F. Supp. 1561, 1582 (N.D. Ga. 1991) (Ward, J.). Upon such filing, the court will then consider the objections to the affidavit when it rules on the substantive motion to which it relates. *Pinkerton*, 650 F. Supp. at 1143; *Southeastern Stages*, 479 F. Supp. at 595.

### II. The Kaltofen Affidavit is Inadmissible in Its Entirety.

#### A. Kaltofen is Not Qualified to Testify About the Operations of Pulp Mills.

Fed. R. Evid. 702 provides, in part, that "a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." When determining whether a proposed expert is qualified, "[t]rial judges must be sensitive to the qualifications of persons claiming to be expert." *In re Air Crash Disaster at New Orleans, La.*, 795 F.2d 1230, 1233-34 (5th Cir. 1986). In determining whether a witness is qualified to testify as an expert, a "court makes the determination based on the witness' actual qualifications and knowledge of the subject matter and not his title." *In re "Agent Orange" Product Liability Litigation*, 611 F.

Supp. 1223, 1242 (E.D. N.Y. 1985) (Weinstein, J.), *aff'd*, 818 F.2d 187 (2nd Cir. 1987), *cert. denied, sub nom Lombardi v. Dow Chemical Co.*, 487 U.S. 1234 (1988). *Accord Christophersen v. Allied-Signal Corp.*, 939 F.2d 1106, 1113 (5th Cir. 1991) (*en banc*) ("the inquiry must be into actual qualification"), *cert. denied*, 503 U.S. 912 (1992).

In addition, an expert must have "the requisite knowledge, skill, education, training and experience to testify as to the subject matter of his proffered testimony." *Bailiff v. Manville Forest Products Corp.*, 772 F. Supp. 1578, 1582 (S.D. Miss. 1991). "Modern science is highly specialized", *Braun v. Lorillard, Inc.*, 84 F.3d 230, 235 (7th Cir.), *cert. denied*, 117 S. Ct. 480 (1996), and Rule 702 requires "that a witness must be qualified in the specific subject for which his testimony is offered." *Whiting v. Boston Edison Co.*, 891 F. Supp. 12, 24 (D. Mass. 1995).

Courts in every Circuit require a witness to be qualified in the specific discipline about which he or she proposes to testify. General knowledge, skill, training, education or experience will not suffice when the relevant testimony requires "a certain degree of specialization." *McLendon.v. Georgia Kaolin Co., Inc.*, 841 F. Supp. 415, 418 (M.D. Ga. 1994). For example,

> "no medical doctor is automatically an expert in every medical issue merely because he or she has graduated from medical school or has achieved certification in a medical specialty. Indeed, a medical doctor who is quick to proclaim general and universally binding principles based on his or her own very limited knowledge or experience in the precise medical issue in question is more likely to mislead a jury than to help them find the truth. In science, a proposition is not true just because one claiming to be an "expert" is willing to make such a statement. In law, a statement is not admissible just because a self-proclaimed "expert" is willing to say it on the witness stand."

*O'Conner v. Commonwealth Edison Co.*, 807 F. Supp. 1376, 1390 (C.D. Ill. 1992), *aff'd*, 13 F.3d 1090 (7th Cir.), *cert. denied*, 512 U.S. 1222 (1994). *Accord Christophersen,* 939 F.2d at 1113.

In *Tokio Marine & Fire Insurance Co. v. Grove Manufacturing Co.*, 958 F.2d 1169, 1174 (1st Cir. 1992), the First Circuit upheld the exclusion of a proposed crane expert because he "never operated nor performed maintenance on a crane. He had never designed cranes nor worked for a crane manufacturer. There was no evidence of publication or in-depth study on the subject of cranes." Similarly, in *Thomas J. Kline, Inc. v. Lorillard, Inc.*, 878 F.2d 791, 799-800 (4th Cir. 1988), *cert. denied*, 493 U.S. 1073 (1990), the Fourth Circuit held it was reversible error to admit expert testimony concerning discriminatory conduct under the Robinson-Patman Act because the witness had not published any articles having "to do with price discrimination, credit, or antitrust generally", and because "[t]here was no indication . . . that [the expert's] general business education included *any* training in the area of antitrust or credit" and that she "lacked *any* other experience in such matters." (emphasis in original). In *Sullivan v. Rowan Companies, Inc.*, 952 F. 2d 141, 144 (5th Cir. 1992), the Fifth Circuit affirmed the exclusion of testimony by an expert with a bachelor's degree in earth science and a master's and Ph.D. in geology because he lacked any academic or other training or experience in metallurgy, the specific discipline relevant to the issue in the case. In *McCullock v. H. B. Fuller Co.*, 981 F. 2d 656, 657 (2nd Cir. 1992), the Second Circuit held that it was proper to permit an electrical and industrial engineer to testify about a ventilation system, but upheld the exclusion of the expert's opinion on the adequacy of

the defendant's warnings because "he lack[ed] training or experience in chemical engineering, toxicology, environmental engineering, or the design of warning labels." In *Watkins v. Telsmith, Inc.*, 121 F. 3d 984, 988 (5th Cir. 1997), the Fifth Circuit affirmed the exclusion of testimony by a witness who was "unqualified as an expert because his training is in civil engineering, while the expertise required by this case, of which [the witness] possesses little, lies in mechanical engineering." In *Genty v. Resolution Trust Corp.*, 937 F. 2d 899, 917-18 (3rd Cir. 1991), the Third Circuit upheld the exclusion of testimony by a Ph.D. toxicologist because he had no particular or specialized experience with the toxic chemicals at issue in the case.[2]

Mr. Kaltofen appears to mislead this Court about his credentials. Mr. Kaltofen claims to "have a Bachelor of Science degree in General Engineering and Chemistry from Boston University" and some graduate work in civil engineering from Northeastern

---

[2] This Court also recognized that a witness must be qualified in the specific discipline for which his or her testimony is being offered. In *Joiner v. General Electric Co.*, 864 F. Supp. 1310 (N.D. Ga. 1994) (Evans, J.), the plaintiffs sought to have a medical doctor testify that furans are formed when PCBs are exposed to a certain temperature. Although excluding his testimony on other grounds, this Court remarked that it was "troubled by the fact that Dr. Schecter is a medical doctor, not a chemist." 864 F. Supp. at 1318.

See also *Diaz v. Johnson Matthey, Inc.*, 893 F. Supp. 358, 372-73 (D. N.J. 1995); *Chikovsky v. Ortho Pharmaceutical Corp.*, 832 F. Supp. 341, 345 (S.D. Fla. 1993); *Diviero v. Uniroyal Goodrich Tire Co.*, 114 F.3d 851, 853 (9th Cir. 1997); *Caputo v. Boston Edison Co.*, CIV. A. No. 88-2126-Z, 1990 WL 98694, at * 3 (D. Mass. July 9, 1990), *aff'd*, 924 F.2d 11 (1st Cir. 1991); *Mancuso v. Consolidated Edison Co. of New York, Inc.*, 967 F. Supp. 1437, 1443 (S.D. N.Y. 1997); *Wintz v. Northrop Corp.*, No. 95 C 815, 1995 WL 758114, at * 3 (N.D. Ill. Dec. 22, 1995), *aff'd*, 110 F.3d 508 (7th Cir. 1997); *Wilson v. City of Chicago*, 6 F.3d 1233, 1239 (7th Cir. 1993), *cert. denied*, 511 U.S. 1088 (1994); *Israel Travel Advisory Service v. Israel Identity Tours, Inc.*, No. 92 C 2379, 1993 WL 387346, at * 1(N.D. Ill. Sept. 23, 1993); *United States v. Jones*, 24 F.3d 1177, 1180 (9th Cir. 1994); *Livshits v. Natural Y Surgical Specialties, Inc.*, No. 87 Civ. 2403 (WK), 1991 WL 261770, at *7 (S.D.N.Y. Nov. 27, 1991).

University. Kaltofen Aff. ¶ 2. On June 25, 1996, however, Mr. Kaltofen gave sworn deposition testimony in an action styled *Allen v. Akzo Nobel Coatings, Inc.*, Cause No. B-0153035 (Dist. Ct., Jefferson Cty., Texas). Mr. Kaltofen was asked the following question, and gave the following answer, regarding his qualifications:

"Q.     You do not have a degree in any field of - of chemistry; is that accurate?

A.     I have completed an American Chemical Society accredited chemistry curriculum, but my degree is actually in general engineering. It's not a separate degree in chemistry."

Kaltofen Deposition Transcript in *Allen*, at pp. 11 (line 25) - 12 (lines 1-5) ("*Allen* Kaltofen Tr.") (relevant pages of which are annexed hereto as Exhibit A). Mr. Kaltofen further testified in *Allen* that the majority of his engineering work experience was limited to "civil sanitary engineering." *Allen* Kaltofen Tr. (Ex. A) at p. 19 (lines 6-10). Mr. Kaltofen also was working for Mr. Hilliard, Plaintiffs' counsel here, in *Allen*.

In *Mackbee v. Ford Motor Co.*, 327 So. 2d 654, 656 (La. App.), *app. denied*, 332 So.2d 279 (La. 1976), the court held that it was proper to exclude the testimony of an expert who, like Mr. Kaltofen, "untruthfully represented his qualification as an expert" because "it is doubtful that, absent that perjury, he would have been accepted as an expert witness." "Moreover, . . . a professional person's misrepresentation of his or her qualifications on a resume or otherwise, [footnote omitted] constitute dishonorable and impermissible behavior." *Joseph v. District of Columbia Board of Medicine*, 587 A.2d 1085, 1088 (D.C. App. 1991). *See also Department of Conservation v. Strassheim*, 415 N.E. 2d 1346, 1352 (Ill. App. 1981) ("qualifications as an expert were tied in with his experience and a false answer as to that experience was relevant to his credibility");

*Ripka v. Mehus*, 390 N.W. 2d 878, 880 (Minn. Ct. App. 1986) ("jury could reasonably have found the prior statements regarding his qualifications to be probative of his credibility").

Mr. Kaltofen offers opinions on substances he claims are generated and then discharged by Georgia-Pacific's Brunswick pulp mill. Neither his affidavit nor his C.V. indicates that Mr. Kaltofen has ever seen a pulp mill, much less acquired any specialized knowledge regarding its chemical processes. His engineering work has been limited to "civil sanitary engineering." Ex. A. Nonetheless, he states the Brunswick mill must generate and discharge PCBs, chlorinated guaiacols, chlorinated dibenzodioxins and dibenzofurans, and mercury. Kaltofen Aff. ¶ 6. Mr. Kaltofen's opinions must be excluded because he is not qualified by knowledge, skill, experience, training, or education regarding the operation and discharges of a pulp mill.

In *Beech v. Leaf River Forest Products, Inc.*, 691 So.2d 446 (Miss. 1997), Elmo Zumwalt, like Mr. Kaltofen here, was offered as an expert witness regarding, *inter alia*, the operation of a pulp mill and its discharges. The Mississippi Supreme Court affirmed the exclusion of Zumwalt's testimony under Miss. R. Evid. 702 -- which is similar to Fed. R. Evid. 702 -- because, like Mr. Kaltofen, he "had no understanding of the manufacturing process in the pulp and paper industry." 691 So. 2d at 451.

Attached to Mr. Kaltofen's C.V. is a list of his "Professional Achievements." Only one "achievement" concerns any of the substances discussed in his affidavit. Specifically, Mr. Kaltofen claims to have "Designed and performed field study of polychlorinated dibenzodioxins and dibenzofurans in a manufacturing facility and its

environs, including the oversight and conduction of all sampling, data validation, and laboratory audits." Kaltofen Aff., C.V. This "achievement", however, is insufficient to qualify him as an expert in this case. In *Trail v. Civil Engineer Corp.*, 849 F. Supp. 766, 768 (W.D. Wash. 1994), the court held that a witness who "may be qualified as an expert on sampling and testing for hazardous substances" did not show "any expert qualification regarding health effects associated with hazardous substances." Because the witness was not qualified regarding the health effects of hazardous substances, his testimony was excluded because it amounted to "subjective belief or unsupported speculation." *Id.*

Mr. Kaltofen clearly is not qualified regarding the operations and processes of a pulp mill, including the formation of any substances in those processes. His opinions are "subjective belief or unsupported speculation" and must, therefore, be excluded.

B. Kaltofen's Affidavit is Based Entirely on Hearsay and Other Inadmissible Evidence.

Based on one study, which he does not provide, Mr. Kaltofen claims that pulp mills discharge chlorinated guaiacols. Kaltofen Aff. ¶ 4. Based on another study, which he also does not provide, Mr. Kaltofen claims that paper mills generate polychlorinated dioxins and furans. *Id.* ¶ 6. Based on an RTK NET "database" he obtained from the internet, which he does provide, Mr. Kaltofen claims pulp mills generate PCBs. *Id.* ¶ 5. None of these documents relates to Georgia-Pacific's Brunswick pulp mill. There are over 100 pulp mills in the United States and Mr. Kaltofen baldly assumes that they all use the same processes. This is patently ridiculous. Nonetheless, based solely on these documents, Mr. Kaltofen claims "It is both scientifically probable or even specifically documented that GP's kraft paper mill in Brunswick also discharges chlorinated organic

wastes, including PCBs, Chlorinated guaiacols, and Chlorinated Dibenzodioxins and Dibenzofurans." Kaltofen Aff. ¶ 6. Such baseless conjecture is inadmissible.

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786 (1993), the United States Supreme Court issued standards for the admission of expert testimony under Fed. R. Evid. 702. Since that time, numerous courts have ruled on the admissibility of proposed expert testimony, but only one has gone up to the Supreme Court. That case arose out of this Court. *Joiner v. General Electric Co.*, 864 F. Supp. 1310 (N.D. Ga. 1994) (Evans, J.). In *Joiner*, the Supreme Court held that this Court correctly applied *Daubert*. *General Electric Co. v. Joiner*, __ U.S. __, 118 S. Ct. 512 (1997). Coincidentally, *Joiner* also involved proposed expert testimony regarding PCB, dioxin and furan formation and exposure under certain conditions.

In *Joiner*, plaintiffs submitted the affidavit of Dr. Arnold Schecter to support their arguments that (1) all PCBs are always contaminated with furans, (2) furans are created when PCBs are burned, and (3) dioxins can be created by heating and burning PCBs. As support, Dr. Schecter "offer[ed] a number of citations to learned treatises." 864 F. Supp. at 1317; *see also id.* at 1319. Like Mr. Kaltofen here, Dr. Schecter did not provide the court with a copy of the cited article. *Id.* at 1317 n. 13. This Court held that "[t]his purported evidence is unavailing. Evidence offered in connection with a motion for summary judgment, whether contained in an affidavit or otherwise, must be admissible. . . . The learned treatises, being hearsay, are inadmissible." *Id.* at 1317. Likewise, the Court held that Dr. Schecter's affidavit concerning the formation of "dibenzofurans and

deadly dioxins" when PCBs are burned was inadmissible because it "comes from a learned treatise and is thus hearsay." *Id.* at 1319.

The Eleventh Circuit reversed. *Joiner v. General Electric Co.*, 78 F. 3d 524 (11th Cir. 1996). The United States Supreme Court, however, reversed the 11th Circuit and held that this Court did not abuse its discretion in excluding the expert testimony because it "did not rise above 'subjective belief or unsupported speculation.'" 118 S. Ct. at 516. The Supreme Court also held that "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert." *Id.* at 519.

Mr. Kaltofen's opinions are based entirely on hearsay and do not rise above subjective belief or unsupported speculation. The Eleventh Circuit has held that

"Rule 703. . . is not an open door to all inadmissible evidence disguised as expert opinion. Although experts are sometimes allowed to refer to hearsay evidence as a basis for their testimony, such hearsay must be the type of evidence reasonably relied upon by experts in the particular field in forming opinions or inferences on the subject."

*United States v. Scrima*, 819 F.2d 996, 1002 (11th Cir. 1987). Mr. Kaltofen has made no showing that the sparse and unrelated data upon which he bases his opinions are customarily relied upon by qualified experts in this field. As in *Joiner*, his testimony "is unavailing" and inadmissible.

## C. Kaltofen's Affidavit Fails the "Fit" Test.

In *Daubert*, the Supreme Court held that "[e]xpert testimony which does not relate to an issue in the case is not relevant, and, ergo, nonhelpful.'" *Daubert*, 113 S. Ct. at 2795 (*quoting* 3 Jack Weinstein & Margaret Berger, *Weinstein's Evidence* ¶ 702[02]).

The Supreme Court also explained that "Rule 702's 'helpfulness' standard requires a
valid scientific connection to the pertinent inquiry as a precondition to admissibility." *Id.*
at 2796. Citing *United States v. Downing*, 753 F. 2d 1224, 1242 (3rd Cir. 1985), the
Supreme Court noted that this "consideration has been aptly described . . . as one of 'fit'."
*Id.* at 2796. On remand, the Ninth Circuit in *Daubert v. Merrell Dow Pharmaceuticals,
Inc.*, 43 F. 3d 1311, 1321 n. 17 (9th Cir. 1995) ("*Daubert II*"), held that "Federal judges
must therefore exclude proffered scientific evidence under Rules 702 and 403 unless they
are convinced that it speaks clearly and directly to an issue in dispute in the case."

None of the statements, contents, conclusions or opinions in Mr. Kaltofen's
Affidavit "fit" this case. Mr. Kaltofen's Affidavit does not rely on any data from
Georgia-Pacific's Brunswick pulp mill or from the Brunswick, Georgia area in general.
He does not rely on or even refer to any data from any Plaintiff or any Plaintiff's
property. This Court has held such an empty expert opinion is inadmissible. *Williamson
v. General Motors Corp.*, Civ. A. No. 1:93-cv-227-RHH, 1994 WL 660649, at *5 (N.D.
Ga. Sept. 30, 1994), *aff'd*, 67 F.3d 314 (11th Cir. 1995). And while he claims to "have
visited key sites in Brunswick" and "collected and analyzed environmental specimens
from Brunswick and its surroundings", Kaltofen Aff. ¶ 3, Mr. Kaltofen does not identify
those "key sites" or report test results of any "environmental specimens". This gratuitous
statement, therefore, is irrelevant and inadmissible. *See In re TMI Litigation*, 927 F.
Supp. 834, 861 n. 51 (M.D. Pa. 1996) ("Plaintiffs have placed no admissible evidence on
the record which explains where each of the samples were taken from. As such, this
evidence fails to create a material factual dispute.").

Mr. Kaltofen's opinions rest on two articles and an internet "database." The two articles are hearsay; the database is double-hearsay (and wholly unreliable). Neither article he cites for the proposition that certain substances are discharged by Georgia-Pacific's Brunswick pulp mill relate to the Georgia-Pacific mill.

Similarly, the double-hearsay RTK NET "database" of PCB "sources" is wholly unrelated to Georgia-Pacific's Brunswick pulp mill. This "database" purports to list the "release, transfer, and waste quantities" of PCBs reported by 65 pulp and/or paper mills for the year 1987. Georgia-Pacific's Brunswick pulp mill is not listed. In addition, contrary to Mr. Kaltofen's assertion that this "database" proves "[p]aper mills in the United States are known sources of waterborne polychlorinated biphenyls ("PCBs")," Kaltofen Aff. ¶ 5, none of the 65 mills reported generating or releasing any PCBs; all 65 report that they transferred PCBs "off-site".[3] *Id.*, Ex. B. And those transfers were in 1987.

"[S]cientific expert opinion testimony is allowed on the rationale that the expert can tie the facts of a particular case to tested scientific theory." *Bradley v. Brown*, 852 F. Supp. 690, 698 (N.D. Ind.), *aff'd*, 42 F.3d 434 (7th Cir. 1994). "If experts cannot tie their assessment of data to known scientific conclusions, based on research or studies, then there is no comparison for the jury to evaluate." *Porter v. Whitehall Laboratories, Inc.*, 9 F.3d 607, 614 (7th Cir. 1993).

Because he does not link these studies or the RTK NET "database" to Georgia-Pacific's Brunswick pulp mill, Mr. Kaltofen's Affidavit fails the "fit" test. Mr. Kaltofen

---

[3] The "database" also cautions that it was only a "MEDIUM" "Level of Detail" search and does not give a breakdown of releases for the entirety of any of the 65 mills.

"is unable to provide any scientifically valid basis to support the leap from those studies

to his opinion in this case." *Cavallo v. Star Enterprise*, 892 F. Supp. 756, 769 (E.D. Va.

1995), *aff'd in part, rev'd in part*, 100 F.3d 1150 (4th Cir. 1996), *cert. denied*, 118 S. Ct.

684 (1998). As a result, "'the analytical gap between the evidence presented and the

inferences to be drawn on the ultimate issue . . . is too wide.'" *Conde v. Velsicol*

*Chemical Corp.*, 24 F.3d 809, 814 (6th Cir. 1994) (*quoting Turpin v. Merrell Dow*

*Pharmaceuticals, Inc.*, 959 F.2d 1349, 1360 (6th Cir. 1992)).

Mr. Kaltofen's statements regarding PCBs and other substances and pulp mills

plainly do not "fit" this case. And "nothing in either *Daubert* or the Federal Rules of

Evidence requires a district court to admit [Mr. Kaltofen's] opinion evidence which is

connected to [Georgia-Pacific's Brunswick pulp mill] only by the *ipse dixit* of" Mr.

Kaltofen. *General Electric Co. v. Joiner*, 118 S. Ct. at 519.

In *Joiner*, the plaintiffs' experts had no evidence that the City of Thomasville's

transformers that Mr. Joiner repaired contained dioxins and furans. Nonetheless,

plaintiffs' expert, Dr. Teitelbaum, testified:

> "I think that one simply has to look at the likely chemistry of the situation and
> what's known about PCBs manufactured in this period and assume that there was
> some furan present, that there may have been some dioxin present, depending on
> the particular fire and circumstance. There probably was some chlorinated
> benzene since that's almost always a contaminant."

*Joiner*, 864 F. Supp. at 1321. This Court ruled that this (and Dr. Schecter's similar)

testimony "manifestly does not fit the facts of this case, and is therefore inadmissible."

*Id.* at 1322.

Numerous courts have rejected the same methodology employed by Mr. Kaltofen

to opine that certain substances are generated by Georgia-Pacific. The expert affidavit in

*Textron Inc. v. Barber-Colman Co.*, 903 F. Supp. 1546 (W.D. N.C. 1995)("*Textron I*"), is

remarkably similar to Mr. Kaltofen's in this case.

> "Koon asserts that given certain waste-producing operations at the plant, metal-working and cooling water discharge, it is reasonable to infer that heavy metals would be present in Burlington's wastewater tank "probably all of the time." But Koon has no factual basis concerning how metal-working operations performed at the Burlington plant contributed heavy metals to the wastewater stream. His opinion reflects this absence of foundation."

*Textron I*, 903 F. Supp. at 1554. The court rejected this opinion.

> "But absent some specific facts confirming that such wastes were generated and linking these wastes to the wastewater system, his "expert opinion" on this issue is precisely the sort of conjecture that is *not* sufficient to withstand a motion for summary judgment."

*Id.* (Emphasis in original). In a related opinion, *Textron Inc. v. Barber-Colman Co.*, 903

F. Supp. 1558 (W.D. N.C. 1995), ("*Textron II*"), the same court excluded another opinion

by this expert that household wastewater from 30-40 homes contained hazardous

substances that originated from defendants' operations. The expert, Koon, relied on

studies concerning hazardous substances found in various household waste. None

involved the 30-40 homes at issue. First, the court noted that "general studies cannot be

used to draw conclusions in specific cases." *Textron II*, 903 F. Supp. at 1569. Second,

like Mr. Kaltofen here, "Koon offers nothing by way of comparison that would equate the

households connected to Dixie's wastewater systems with those sampled in the studies."

*Id.* As a result, the court held "Koon's opinion is not sufficiently tied to the facts of this

case because he has offered no basis for his opinion that the studies relied upon are

sufficiently similar to the households connected to Dixie's wastewater system to merit

comparison." *Id.*

In *United States v. SCA Services of Indiana, Inc.*, Civ. No. 1: 89 cv 29, 1995 WL

569634 (N.D. Ind. Aug. 15, 1995), the fourth-party plaintiffs alleged Hardware

Wholesalers, Inc. ("HWI") deposited products containing hazardous substances at the

property in question, and submitted an expert affidavit claiming HWI's product must

have contained hazardous substances because similar products did. The court noted,

however, that

> "Meyers has not set forth any factual basis (such as chemical analysis or even
> review of labels of various brands) for his conclusions that the listed products
> always contain hazardous substances. Additionally, Meyers' CV does not support
> an assumption that he is competent to discern the chemical analysis of products.
> Although Meyers minored in chemistry at the undergraduate level, his studies
> concentrated on geology and he is a certified professional geologist, not a
> chemist."

*SCA Services*, 1995 WL 569634, at \*10 n. 1. The Court struck the affidavit because

> "a conclusion that certain products contain various hazardous constituents, and
> that all products in this class contain the same hazardous constituents, must be
> supported by some sort of foundation. Meyers' affidavit clearly lacks this
> foundation."

*Id.* at 6. Likewise, in *United States v. Atlas Minerals and Chemicals, Inc.*, Civ. A. No.

91-5118, 1993 WL 518421 (E.D. Pa. Dec. 7, 1993), the third-party plaintiffs alleged

Kleinert's trash contained hazardous substances and submitted "an affidavit that

contain[ed] an expert opinion about the compositon of Kleinerts' office waste." 1993

WL 518421, at \*2. The Court ruled the affidavit was speculative and insufficient to

defeat summary judgment.

> "This opinion is based upon the expert's knowledge of what office waste
> generally contains. Absent some evidence on the actual composition of Kleinert's

205600                                   -20-

waste beyond mere speculation as to what "office waste" would likely contain, the third-party plaintiffs cannot avoid summary judgment on this issue. The third-party plaintiffs have identified no such evidence. Mere speculation and assumption that these materials were sent to the site are insufficient to demonstrate a genuine issue."

*Id.*, at *2.

In *B.F. Goodrich Co. v. Murtha*, 840 F. Supp. 180 (D. Conn. 1993), an expert inferred that defendants' municipal solid waste contained certain amounts of hazardous substances based on reports of hazardous substances in other municipal solid waste. Because the expert had no data from defendant's waste, and he failed in any way to show why defendant's waste was similar to the other waste, the court held the affidavit was "at once second hand and factually sparse." *Id.* at 189. *See also Dana Corp. v. American Standard, Inc.*, 866 F. Supp. 1481, 1505 (N.D. Ind. 1994) (plaintiffs produced no evidence that established that any of defendant's waste contained hazardous substances); *Sorensen v. Shaklee Corp.*, 31 F.3d 638, 648 (8th Cir. 1994) (expert's testimony was inadmissible because he did not show that the tablets in question contained ethylene oxide).

Mr. Kaltofen's affidavit here simply does not "fit" this case. His reliance on unrelated and unobjective hearsay and the complete absence of any data from Georgia-Pacific and the Plaintiffs themselves is a wholly inadequate foundation on which to base any opinion in this case. "Expert opinions are worthless without data and reasons." *Kenosha Liquor Co. v. Heublein, Inc.*, 895 F.2d 418, 420 (7th Cir. 1990). Mr. Kaltofen's bald, unsubstantiated and conclusory opinions are worthless.

D.     The Foundation of Kaltofen's Affidavit is Unreliable.

The Kaltofen affidavit lacks "fit" because pulp mills do not make PCBs. This

Court previously noted that "Monsanto manufactured PCBs from 1935 to 1977." *Joiner*,

864 F. Supp. at 1312. Further, General Electric and Westinghouse each manufactured

transformers and fire-resistant fluids that contained PCBs. Not surprisingly, pulp and

paper mills, like many other entities, may have used transformers in their operations. For

example, the City of Thomasville, Georgia utilized PCB transformers for a period of

time. *Id.* at 1312. But no honest scientist would then conclude that the City of

Thomasville generated or manufactured PCBs. In any event, when transformers need to

be repaired or replaced, the PCBs are disposed of by transferring them off-site pursuant to

various federal regulations. And this is exactly what Mr. Kaltofen's RTK NET

"database" indicates 65 pulp and/or paper mills did with PCBs in 1987.

In 1987 there were approximately 104 pulp and paper mills in the United States.



One of Mr. Kaltofen's weapons in his war against corporate America is the RTK NET "database." On his internet Home Page [cite], Mr. Kaltofen provides a manual on the art of "Ecosleuthing" in order to "Become Your Own Pollution Private Detective". A copy of this manual is annexed hereto as Exhibit B. In his "Ecosleuthing" manual, Mr. Kaltofen instructs the reader how to obtain information about corporations, and he claims that "[m]uch . . . data is presented with more of an *activist slant* at the Right to Know Network". Exhibit B at 7. (Emphasis added). And the Right to Know Network itself boasts that "[Marco Kaltofen] uses RTK NET to keep in touch with the pulse of the grassroots movement." The RTK NET Newsletter, Vol. 3, No. 4, p. 9 (Spring 1994), a copy of which is annexed hereto as Exhibit C.[4]

"Rule 703 of the Federal Rules of Evidence attempts to delimit the bases upon which an expert may rely in testifying to those 'reasonably relied' upon 'by experts in the field.'" *In re "Agent Orange,"* 611 F. Supp. at 1243. Thus, "Rule 703 . . . requires courts to examine the reliability of [an expert's] sources." *Soden v. Freightliner Corp.*, 714 F.2d 498, 505 (5th Cir. 1983). "When making this assessment, 'the trustworthiness of the underlying data is not irrelevant.'" *Barrel of Fun, Inc. v. State Farm Fire & Casualty Co.*, 739 F.2d 1028, 1033 (5th Cir. 1984). The Eleventh Circuit has held that when data relied upon by the expert is "of questionable objectivity and unofficial" the district court is "authorized to reject the opinion entirely." *United States v. Esle*, 743 F.2d

---

[4] Georgia-Pacific submits that, like the expert in *In re "Agent Orange,"* 611 F. Supp. at 1246, "the unreasonableness of [Mr. Kaltofen's] affidavit[ ] is so blatant that a hearing would be useless." If a Rule 104(a) hearing is held, however, Mr. Kaltofen should explain to this Court why he failed fully to disclose the origins and nature of his "data" and the methodology he followed by using data with "an *activist slant*" from "the grassroots movement."

1465, 1474 (11th Cir. 1984), *reh'g denied*, 755 F.2d 176 (11th Cir. 1985). In sum, "[i]f

the underlying data are so lacking in probative force and reliability that no reasonable

expert could base an opinion on them, an opinion which rests entirely upon them must be

excluded." *Agent Orange*, 611 F. Supp. at 1245.

By definition, the "activist slant" - "grassroots" RTK NET "database" relied on by

Mr. Kaltofen is unreliable, untrustworthy and unobjective. As a result, this Court should

"reject [his] opinion entirely." *United States v. Esle*, 743 F.2d at 1474.

    E.    Kaltofen's Methodology is Wholly Unreliable.

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786

(1993), the Supreme Court held that when

> "Faced with a proffer of expert scientific testimony, then, the trial judge
> must determine at the outset, pursuant to Rule 104(a), whether the expert
> is proposing to testify to (1) scientific knowledge that (2) will assist the

> preliminary assessment of whether the reasoning or methodology
> underlying the testimony is scientifically valid and of whether that
> reasoning or methodology properly can be applied to the facts in issue."

113 S. Ct. at 2796 (footnotes omitted). In making this assessment, the Supreme Court

listed four non-exclusive factors to consider: (1) whether the expert's theory can be, or

has been tested; (2) whether the expert's theory or technique has been peer reviewed and

published; (3) the known or potential rate of error of the expert's theory or technique; and

(4) whether the expert's theory or technique has gained general acceptance in the relevant

scientific community. *Id.* at 2796-97. Mr. Kaltofen's affidavit does not satisfy any of

these criteria.

The only document Mr. Kaltofen provides a copy of is the RTK NET "database". As discussed above, this "database" does not pass Fed. R. Evid. 703's reliability standards. In any event, according to Mr. Kaltofen, the "database" "reveals that paper mills, including those owned by Georgia-Pacific, have historically reported large *generation* of PCB waste." Kaltofen Aff. ¶ 5 (emphasis added). While Georgia-Pacific owns one of the 65 mills listed on the "database" -- it is in Nekoosa, Wisconsin -- unfortunately for Mr. Kaltofen, he cannot rely on the currently fashionable protest that this testimony "is legally accurate." Contrary to his sworn assertion, the "database" clearly states that in 1988 Georgia-Pacific's Nekoosa mill had "Off-Site Transfer[s]" of 36,000 lbs. of PCBs. It does not state that the Nekoosa mill generated or released any PCBs.

When, as here, expert testimony is based on literature that does not support the witness' conclusion, the testimony is inadmissible under Rule 702 because it amounts to "speculative belief or unsupported speculation." *See Rutigliano v. Valley Business Forms*, 929 F. Supp. 779, 785 (D. N.J. 1996) ("Reliance upon medical literature for conclusions not drawn therein is not an accepted scientific methodology."), *aff'd, sub nom Valley Business Forms v. Graphic Fine Color, Inc.*, 118 F.3d 1577 (3rd Cir. 1997); *Mitchell v. Gencorp, Inc.*, 968 F. Supp. 592, 600 (D. Kan. 1997). Similarly, because its underlying support is so incomplete, dated by more than a decade, and not related in any way to the Georgia-Pacific Brunswick pulp mill, Mr. Kaltofen's "affidavit[ ] represent[s] nothing more than bare conclusions derived from erroneous data." *Slaughter v. Southern Talc Co.*, 919 F.2d 304, 307 (5th Cir. 1990).

In *Daubert II*, 43 F.3d at 1319 n. 11, the Ninth Circuit explained that the Supreme

Court's mandate that an expert's methodology be reliable means that "the party

proffering the evidence must explain the expert's methodology and demonstrate in some

objectively verifiable way that the expert has both chosen a reliable scientific method and

followed it faithfully." Further, "[f]or such a showing to be sufficient, the experts must

explain precisely how they went about reaching their conclusions", *id.* at 1319.

The court in *Bell v. Swift Adhesives, Inc.*, 804 F. Supp. 1577, 1579 (S.D. Ga.

1992), held that "an expert's affidavit must . . . set forth specific facts in order to create an

issue of fact for trial." (*citing Evers v. General Motors Corp.*, 770 F.2d 984, 986 (11th

Cir. 1985)). Further, this Court has held that

> "Theoretical speculation, unsupported assumptions and conclusory allegations
> advanced by an expert are neither admissible at trial [citation omitted] nor are
> they entitled to any weight when raised in opposition to a motion for summary
> judgment."

*E. T. Barwick Industries, Inc. v. Walter E. Heller and Co.*, 692 F. Supp. 1331, 1347 (N.D.

Ga. 1987) (Murphy, J.) (*quoting Reazin v. Blue Cross and Blue Shield of Kansas, Inc.*,

663 F. Supp. 1360, 1479 (D. Kan. 1987)), *aff'd*, 891 F.2d 906 (11th Cir. 1989). *See also*

*Story v. Latto*, 702 F. Supp. 708, 709 (N.D. Ill. 1989) ("an opinion, even if rendered by an

expert, does not create a genuine issue of material fact unless the expert sets forth specific

facts to support his opinion."); *Reynard v. NEC Corp.*, 887 F. Supp. 1500, 1506 (M.D.

Fla. 1995) (*quoting Bell v. Swift Adhesives, Inc.*, 804 F. Supp. 1577, 1579 (S.D. Ga.

1992)). "Admission of expert testimony based on speculative assumptions is an abuse of

discretion." *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 22 (2nd Cir. 1996).

Mr. Kaltofen claims two articles support his conclusion that certain substances come from pulp mills and, therefore, they also come from Georgia-Pacific's Brunswick pulp mill. Because Mr. Kaltofen did not provide the Court copies of the articles he relied on, his opinion cannot be tested. There is no way to determine what, if any, pulp mills the studies refer to, or whether those mills are similar (or dissimilar) in any way to Georgia-Pacific's Brunswick pulp mill. As a result, Mr. Kaltofen's testimony fails to satisfy *Daubert*.

While an expert may rely, in part, on learned treatises or articles published in reputable scientific journals in forming their opinions, *Daubert II* at 1319, the expert must "discuss [that] research in sufficient detail that the district court [can] determine if the research was scientifically valid." *United States v. Rincon*, 28 F.3d 921, 924 (9th Cir.), *cert denied*, 513 U.S. 1029 (1994). Here, Mr. Kaltofen does not discuss or analyze the mills in those two studies, nor does he explain how the conditions or circumstances of the Brunswick pulp mill are sufficiently similar to draw legitimate conclusions from the studies. "Indeed, no understandable scientific basis is stated. Personal opinion, not science, is testifying here." *Turpin v. Merrell Dow Pharmaceuticals, Inc.*, 959 F.2d 1349, 1360 (6th Cir.), *cert. denied*, 506 U.S. 826 (1992). "Judges should not be buffaloed by unreasoned expert opinions." *Mid-State Fertilizer Co. v. Exchange National Bank of Chicago*, 877 F.3d 1333, 1340 (7th Cir. 1989). Expert affidavits devoid of reasoning and explanation, like Mr. Kaltofen's, are inadmissible. *Claar v. Burlington Northern Railroad Co.*, 29 F.3d 499, 502 (9th Cir. 1994).

The fact that Mr. Kaltofen couches his conclusions in terms of "reasonable scientific probability" does not elevate his baseless opinions from the ranks of inadmissible speculation. "Although Dr. Caudill invokes some of the "magic words" normally associated with a diagnosis of insanity, there is no factual basis to support the conclusion that Miles was insane at the time of the attack." *State Farm Fire and Casualty Co. v. Miles*, 730 F. Supp. 1462, 1472 (S.D. Ind. 1990), *aff'd*, 930 F.2d 25 (7th Cir. 1991). The Court excluded this testimony because "[m]ost of Dr. Caudill's statements with respect to Miles' sanity and intent are vague, colloquial, and could be generally categorized as 'mealy-mouthed.'" *Id. Accord Daubert II*, at 1316 (9th Cir. 1995) ("the expert's bald assurance of validity is not enough"); *Viterbo v. Dow Chemical Co.*, 826 F.2d 420, 424 (5th Cir. 1987) ("Without more than credentials and a subjective opinion, an expert's testimony that 'it is so' is not admissible."). Like the expert in *Shatkin v. McDonnell Douglas Corp.*, 727 F.2d 202, 208 (2nd Cir. 1984), Mr. Kaltofen's "assumptions and assertions . . .[are] so unrealistic and contradictory as to suggest bad faith."

F.     Kaltofen Lacks Objectivity and Credibility.

Mr. Kaltofen is reportedly an "environmental guerrilla" and "activist" waging a war against all industry, large or small, and all things man-made. And like most "guerrillas" engaged in personal crusades, Mr. Kaltofen's enviro-jihad tramples on the rights of his enemies and incites others to join him in lawless conduct.

Mr. Kaltofen's *curriculum vitae* lists his "Professional Achievements"[5] including:

---

[5] Mr. Kaltofen's affidavit states that the RTK NET "database" (discussed above) is Exhibit A. Kaltofen Aff. ¶ 5. His C.V. actually is Exhibit A. Plaintiffs acknowledge that

"Extensive public relations and communications experience including appearances or articles with Good Morning America, the Today Show, NBC Nightly News, CNN, C-Span, TBS, National Public Radio, US News & World Report, Chemical & Engineering News, The New York Times, and over 300 technical and other citations."

Kaltofen Aff., C.V. Mr. Kaltofen's "achievements" are on his Home Page and may be accessed *via* America On Line and the Internet. http://home.aol.com/kaltofen. These "achievements" prove Mr. Kaltofen is not qualified to render an expert opinion in this case.

Mr. Kaltofen's "Personal Achievements" lists public relations and communications with, *inter alia*, U.S. News & World Report. Kaltofen Aff., C.V. In the June 26, 1989 U.S. News & World Report, Vol. 106, No. 25, p. 8 (a copy of which is annexed hereto as Exhibit D), Mr. Kaltofen is described as "[a] civilian chemist [who] uses hit-and-run guerrilla tactics as he prowls fouled backwaters and infiltrates companies." Ex. D. Mr. Kaltofen uses deception to break into others' properties to "stag[e] hit-and-run forays," and relishes the role of "an environmental guerrilla" because it is "the kind of direct-action showboating that garners easy headlines and television footage." *Id.*

But war has casualties, and, as of 1989, Mr. Kaltofen "ha[d] been arrested more than a dozen times and convicted once of trespassing." Ex. D. In his affidavit, however, Mr. Kaltofen testified that "I . . . have never been convicted of a felony." Kaltofen Aff. ¶ 1. In fact, Mr. Kaltofen has been arrested so many times in connection with his

---

"the attached Exhibits were mislabeled." Plaintiffs' Reply Brief in Support of Motion to Remand at 19 n. 11. Plaintiffs suggest that "[t]hese irregularities should not diminish the strength of Mr. Kaltofen's qualifications or the persuasiveness of his observations and opinions." *Id.* Georgia-Pacific agrees. *See* n. 4 *supra*.

environmental activism that he cannot remember all his arrests.  On April 19, 1995, Mr.

Kaltofen gave sworn deposition testimony in an action styled *Harding v. Browning -*

*Ferris Industries*, Cause No. 15,527 (Dist. Ct.  Duval Cty. Texas); another case on which

he worked with Plaintiffs' counsel here, Mr. Hilliard.  On pages 102-107 of his *Harding*

deposition (copies of which are annexed hereto as Exhibit E), Mr. Kaltofen testified to

numerous arrests and convictions for trespassing and other "charges" he claimed not to

remember.  Ex. E.  And Mr. Kaltofen's arrest record literally is coast-to-coast, having

been arrested in Santa Monica, California (Ex. E at pp. 102 (lines 16-17) - 103 (line 10)),

Braintree, Massachusetts (*id*. at p. 104 (line 18)), Toms River, New Jersey (*id*. at p. 105

(lines 14-24)), and Everett, Massachusetts (*id*. at p. 106 (lines 3-5)).  Those are the ones

Mr. Kaltofen can remember.  *Id*. at p. 107 (lines 5-7).  Undeniably, any arrests or

convictions based on Mr. Kaltofen's "environmental guerrilla" activities is relevant to his

objectivity and, thus, his qualifications to testify as an expert.

    In *Daubert II*, the Ninth Circuit held that

> "One very significant fact to be considered is whether the experts are proposing to

> conducted independent of the litigation, or whether they have developed their
> opinions expressly for purposes of testifying.  That an expert testifies for money

lawsuit. Mr. Kaltofen's current job includes "[e]xtensive court-related operations and

expert testimony."[6] Kaltofen Aff., C.V. Moreover, the only document supplied by -- the

RTK NET "database" -- is used by Mr. Kaltofen for the very purpose of initiating

litigation.

> "Kaltofen uses RTK NET "in most cases." He spends two to three hours a week
> on RTK NET. Most commonly, he compares the TRI emissions of similar
> companies. If a community group, for example, is planning a suit against a large
> corporation, he will use RTK NET to get information about the environmental
> record of all of the company's facilities."

Exhibit C at 8.

Thus, according to the very source upon which his affidavit is based, Mr. Kaltofen

uses the RTK NET not to conduct scientific research, but to plan lawsuits against large

---

[6] A significant portion of Mr. Kaltofen's job as a lawsuit instigator is for Plaintiffs'
counsel in this case, Mr. Hilliard. In *Allen*, Mr. Kaltofen testified as follows:

> "Q. How much have you been paid by Mr. Hilliard's firm since you began
>    working for him in 1992?
> A. Well, of course, my corporation has been paid. I would guess it's on the order
>    of $150- to 175,000. That number could be incorrect; I'm really taking a stab
>    at it. I know to date in '96 the total I've received - the corporation has
>    received from Hilliard & Munoz has been a little over $50,000.
> Q. In 1996 what percentage of your time has been spent working for Mr.
>    Hilliard?
> A. About a third."

Ex. A at p. 14 (lines 9-20). Moreover, in *Harding*, Mr. Kaltofen testified he is the sole
employee, shareholder and officer of his corporation. *Harding* Kaltofen Tr. (Ex. E) at p.
24 (lines 3-23). Just last year, the Texas Supreme Court upheld sanctions against Mr.
Hilliard for forum shopping and abusing the judicial process. *In re Bennett*, 960 S.W.2d
35 (Texas 1997), *petition for cert. filed*, 66 USLW 3800 (June 11, 1998). Similarly in
this case, Mr. Hilliard is abusing the judicial process by filing in a forum with no
connection to the dispute. The Texas Supreme Court held that Mr. Hilliard's "conduct, if
tolerated, breeds disrespect for and threatens the integrity of our judicial system." 960
S.W.2d at 40. This Court also should not tolerate Mr. Hilliard's abusive forum shopping
and deny Plaintiffs' Motion to Remand.

corporations. Mr. Kaltofen seems to have done exactly that in this case and then to have "developed [his] opinions expressly for purposes of testifying." *Daubert II*, 43 F.3d at 1317. Under *Daubert*, this is not valid science, and Mr. Kaltofen's affidavit should be excluded.

Worse, the application of Mr. Kaltofen's methodology in this case can fairly be characterized as an attempt to defraud this Court. As noted above, Mr. Kaltofen uses the RTK NET "database" as evidence to sue large corporations. In this case, Mr. Kaltofen's RTK NET "database" search disclosed no PCBs being generated, released or transferred off-site by Georgia-Pacific's Brunswick pulp mill. Notwithstanding this lack of data, Plaintiffs now attempt to assert claims for PCB discharges against Georgia-Pacific.

Mr. Kaltofen apparently needs no evidence to attack a "large corporation" or convince a "community group" -- such as the Brunswick Plaintiffs -- to commence a lawsuit. Mr. Kaltofen's anti-corporate obsession makes him blind to facts and data, even his own. In *Johnston v. United States*, 597 F. Supp. 374, 412 (D. Kan. 1984), the court ruled that an expert's "dramatic conflict with all of the world's [other] experts creates a bias in him which destroys his credibility as an objective expert witness . . . His obsession blinds his objectivity!" So too here.

Mr. Kaltofen's obsession is undeniable. Even though the data says something is not there, Mr. Kaltofen is undeterred. This is not new. In one of the 300 citations on his



from auto shops, paint shops, furniture strippers, gas stations, oil refineries, incinerators, dumps, chemical plants, paper mills, and automobiles. *Id.* Mr. Kaltofen claims that pesticides on your lawn, toxic vapors from polluted waters and dust from battery manufacturers are putting you at risk. *Id.* And, for good measure, Mr. Kaltofen warns that landfill gases might blow up your house. *Id.*

It is not unfair to state that Mr. Kaltofen is opposed to all industry, everything man-made, and modern society in general.

If he were merely a harmless crank, Mr. Kaltofen would be no more than a nuisance. But, Mr. Kaltofen also instructs his followers on how to get your "mean wicked bad neighbors." Ex. B at 3. Mr. Kaltofen's targets include, dry cleaners, auto repair shops, gas stations, fuel companies, power plants, industrial parks, farms, railroad tracks, "lawn care freaks", power line right of ways, golf courses, major thoroughfares, University and college laboratories, testing and research laboratories, printers and photo developers, and industrial/commercial launderers. *Id.* at 5. Mr. Kaltofen counsels his disciples on how to infiltrate such facilities and obtain evidence against these bad neighbors. Mr. Kaltofen calls it a "corporate urinalysis." *Id.* at 7. In the process, Mr. Kaltofen encourages lawless behavior.

> "About the bail money in the really advanced tools list; you won't need any if you respect posted property. *If it's not posted then you're not trespassing until you refuse to leave when asked.* But you know how it is, eh? 'Tell it to the judge'."

*Id.* at 8. (Emphasis added). (Mr. Kaltofen should consult with Plaintiffs' other "expert," Ms. Atwell, on the law.)

This is not the only improper conduct Mr. Kaltofen abets. He also advises means to evade law enforcement. For example, Mr. Kaltofen suggests that when trespassing on your neighbor's property, bring a dog. According to Mr. Kaltofen, you can then say "'Why am I walking around this factory at night Mr. Police Officer? Well, I was walking my dog Spot'." Ex. B at 4.

This lawsuit offers Mr. Kaltofen fertile ground for new improper conduct -- abuse of process: testify that a large corporation is guilty when your own facts state the contrary. Fortunately, this Court has seen Mr. Kaltofen's type before and told them they were not welcome. In *Joiner*, Dr. Schecter used similar "scare tactics" about dioxins and furans forming in a New York office building fire. This Court ruled that "Dr. Schecter's conclusory, sensationalistic description of his experience with a transformer fire in New York has little probative value given the evidentiary deficits in this case." *Joiner*, 864 F. Supp. at 1319. Mr. Kaltofen's "sensationalistic" testimony here has even less probative value.

Even courts in other countries have barred their doors to the likes of Mr. Kaltofen. In *Taylor v. Airport Transport and Warehouse Services Ltd.*, No. 90/NJ/5076 (Q.B. Oct. 24, 1991) (a copy of which is annexed hereto as Exhibit G), Mr. Justice MacPherson of the Queen's Bench eloquently put it this way:

> "The lymphocyte test referred to by Dr. Monro in one of her Reports is
>
> negative. It seems to me unfortunate that the phrasing of the relevant report suggests to the outside observer that there might be some significance in that test in favour of Dr. Monro's thesis.
>
> Dr. Monro may be a prophet before her time. But in my judgment her evidence was in many respects bizarre and unscientific. Her qualifications are basic. Her business seems to be unacceptable to the vast majority of Doctors, and

to the Insurance Houses. And her methods and treatment have no parallel or place in the National Health Service routines. I feel that I should say no more.

In my judgment the basic case put forward by Dr. Monro fails. It is the plaintiff's great misfortune that in 1985 and then again after a prolonged gap in 1989 and 1990 she came to be encouraged to believe that she is sensitised. I fervently hope that the end of this case will enable her, perhaps with experienced and appropriate medical or psychiatric help, markedly to improve and to realise that aftershave, perfume, car fumes and the other experiences which she has been led to believe cause her harm, can be endured by her as much as by other people."

*Taylor*, at ** 6-7.

Mr. Kaltofen's similar delusional "scare tactics" also fail here. Mr. Kaltofen is not an objective scientist. He is an admitted biased advocate. Like the expert in *Johnston*, he is a "laughing stock" and "a pathetic figure." 597 F. Supp. at 410. He has no legitimate business with this Court.

## CONCLUSION

For the foregoing reasons, Georgia-Pacific respectfully requests that the Court exclude the entire affidavit of Marco Kaltofen, P.E. In the alternative, Georgia-Pacific requests that the Court conduct a hearing, pursuant to Fed. R. Evid. 104(a), to resolve "[p]reliminary questions concerning the qualification of [Mr. Kaltofen] to be a witness . . . [and] the admissibility of [his] evidence." *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 113 S. Ct. 2786, 2796 n. 10 (1993); *Joiner v. General Electric Co.*, 864 F. Supp. 1310, 1320 (N.D. Ga. 1994).

Dated: September 23rd, 1998

Respectfully Submitted,

W. Ray Persons
Georgia Bar No. 573525
SWIFT, CURRIE, McGHEE & HIERS
1355 Peachtree St., N.E.
Atlanta, Georgia 30309-3238
(404) 874-8800

Of Counsel:

David Boies
Philip C. Korologos
BOIES & SCHILLER LLP
80 Business Park Drive
Armonk, New York 10504
(914) 273-9800

ATTORNEYS FOR DEFENDANT
GEORGIA-PACIFIC CORPORATION

Exhibit A

1 — 348

Allen

**VIDEOTAPED DEPOSITION OF MARCO KALTOFEN - TAKEN JUNE 25, 1996**

**Page 1 to Page 348**

FOR:

**DOUG DOUGHERTY**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY: VICKYE MILLS

*LOONEY & COMPANY*
*500 North Water Street*
*Suite 500*
*Corpus Christi, TX    78471*
*Phone:   512/883-1716*
*FAX:   512/888-6550*

p.10

p.202

## Page 1

```
(1)
(2) ANITA NICHELLE ALLER, ET AL *   IN THE DISTRICT COURT OF
                                *
(3) V.                          *   JEFFERSON COUNTY, TEXAS
                                *
(4) AKZO NOBEL COATINGS, INC.. *
    ET AL                       *   60TH JUDICIAL DISTRICT
(5)
(6)  -------------------------------
     VIDEOTAPED DEPOSITION OF MARCO KALTOFEN
(7)  TAKEN ON JUNE 25, 1996
     -------------------------------
```

## Page 2

```
(1) APPEARANCES:

    Mr. Robert C. Hilliard
    Mr. John Flood
    Mr. Dan Covert
    HILLIARD & MUNOZ
    719 S. Shoreline, Suite 600
    Corpus Christi, Texas 78401
    COUNSEL FOR PLAINTIFFS

    Mr. Russell W. Herbt
    HILLIARD & HEALD, L.L.P.
    550 Fannin, Suite 111
    Beaumont, Texas 77701
    COUNSEL FOR PLAINTIFFS

    Mr. Douglas D. Dougherty
    WOODARD, HALL & PRIMM, P.C.
    7100 Texas Commerce Tower
    Houston, Texas 77002
    COUNSEL FOR DEFENDANT GUARDSMEN PRODUCTS
```

## Page 2

(1) APPEARANCES/continued:

Mr. David White (3) GODWIN & CARLTON, P.C. 901 Main Street, Suite 2500 (4) Dallas, Texas 75202-3714 (5) COUNSEL FOR DEFENDANT DRESSER INDUSTRIES

Mr. H. Daniel Spain (7) WOMBLE & SPAIN 2600 Two Houston, Center (8) 909 Fannin Houston, Texas 77010

COUNSEL FOR DEFENDANT HARBISON-WALKER

(11) Mr. James D. Smith DUNN, KACAL, ADAMS, PAPPAS & LAW, P.C. (12) 2600 America Tower 2929 Allen Parkway at Waugh (13) Houston, Texas 77019-2151 (14) COUNSEL FOR DEFENDANT PPG

Mr. John W. Belk (16) JOHN W. BELK & ASSOCIATES, P.C. 600 Jefferson, Suite 690 (17) Houston, Texas 77002 (18) COUNSEL FOR PIONEER ELECTRONICS (USA)

Mr. James G. Blain (20) ROYSTON, RAYZOR, VICKERY & WILLIAMS, L.L.P. 2200 Texas Commerce Tower (21) 601 Milam Street Houston, Texas 77002-2913

COUNSEL FOR DIXIE CHEMICAL CO., INC.

## Page 3

(1) APPEARANCES/continued:

Mr. Mark E. Easley (3) TAYLOR & EGGLESTON 2701 Fannin Street (4) Houston, Texas 77002 (5) COUNSEL FOR DEFENDANT DELTA DISTRIBUTORS

Mr. Michael L. Atchley (7) KANE, RUSSELL, COLEMAN & LOGAN, P.C. 5. J Thanksgiving Tower (8) 1601 Elm Street Dallas, Texas 75201

COUNSEL FOR NEC HOME ELECTRONICS (USA), INC.

(11) Mr. Kent M. Adams ADAMS, COFFEY & DUESLER, L.L.P.

(12) Petroleum Tower 550 Fannin, Suite 830 (13) Beaumont, Texas 77701 (14) COUNSEL FOR DEFENDANT SAMSUNG

Mr. Gregory A. McGee (16) KASOWITZ, BENSON, TORRES & FRIEDMAN, L.L.P. 700 Louisana Street, Suite 2200 (17) Houston, Texas 77002 (18) COUNSEL FOR DEFENDANT HOECHST CELANESE

Mr. Lansford O. Ireson, Jr.

(20) IRESON & WEIZEL, P.C.

Texas Commerce Bank Building (21) 711 Travis, Suite 3100 Houston, Texas 77002

COUNSEL FOR DEFENDANT AKZO NOBEL & RELIANCE

(24) ALSO PRESENT:

(25) Ms. Debbie Quiroz, Videographer

## Page 4

(1) T A B L E O F C O N T E N T S

                            Page

AGREEMENTS OF COUNSEL . . . . . . . . . . . . 6

EXAMINATION OF MARCO KALTOFEN
By Mr. Dougherty . . . . . . . . . . . . . . 9
By Mr. Ireson. . . . . . . . . . . . . . . . 329

WITNESS' SIGNATURE PAGE . . . . . . . . . . . . 343

CORRECTION SHEET. . . . . . . . . . . . . . . . 344

REPORTER'S CERTIFICATE. . . . . . . . . . . . . 345

(10) * * *

EXHIBITS

(11) * * * (12) No. Description Page (13) 1 Letter from Mr. Kaltofen; billing for 1996 . . 28 (14) 2 Curriculum Vitae of Marco Kaltofen . . . . . . 30 (15) 3 "Review of Environmental Data" . . . . . . . . 31 (16) 4 Letter from Hilliard & Munoz to TNRCC. . . . . 102 (17) 5 TNRCC Documents Regarding Manifested Wastes. . 110 (18) 6 "EPA Documents Reviewed Under FOIA". . . . . . 110 (19) 6-1 Tabbed Pages from Exhibit 6 . . . . . . . . . 281 (20) 7 "NOAA Documents" . . . . . . . . . . . . . 110 (21) 8 Documents from Zenon Laboratories. . . . . . . 110 (22) 9 Documents from Zenon Laboratories. . . . . . . 110 (23) 10 Miscellaneous Documents . . . . . . . . . . . 110 (24) 11 "CNA Industrial Hygiene Survey" . . . . . . . 110 (25) 12 Statement from Harry Barrows and MSDS Sheets. 110

## Page 5

(1) EXHIBITS/continued: (2) 13 Summary of Laboratory Test Results . . . . . 110 (3) 14 Photograph . . . . . . . . . . . . . . . 220 (4) 15 Photograph . . . . . . . . . . . . . . . 220 (5) 16 Photograph . . . . . . . . . . . . . . . 220 (6) 17 Test Results from Zenon Laboratories . . . . 235 (7) 18 Organic Data Package . . . . . . . . . . 254 (8) 19 Map . . . . . . . . . . . . . . . . . . . 254 (9) 20 Zip Disk. . . . . . . . . . . . . . . . . *323

(25) * Exhibit Retained by Counsel

## Page 6

(1) A G R E E M E N T S (2) DEPOSITION AND ANSWERS of MARCO KALTOFEN, who (3) resides in Natick, Massachusetts, taken herein by (4) Counsel for DEFENDANT GUARDSMEN PRODUCTS, before (5) TEENA HARMON, a Certified Shorthand Reporter in and for (6) the State of Texas, on JUNE 25, 1996, between the hours (7) of 9:30 a.m. and 6:00 p.m. in the offices of (8) Hilliard & Munoz, 719 S. Shoreline, Suite 600, (9) Corpus Christi, Texas, 78401, pursuant to NOTICE and (10) the following stipulations and agreements:

(11) IT WAS AGREED by and between counsel for the (12) Plaintiffs and Defendants in the above-numbered and (13) styled cause, that all formalities are specifically (14) waived and that the deposition of MARCO KALTOFEN may be (15) taken herein forthwith before TEENA HARMON, a Certified (16) Shorthand Reporter in and for the State of Texas, said (17) deposition being taken with the same force and effect (18) as though all the requirements of the State statutes (19) and rules had been fully complied with.

(20) IT WAS FURTHER AGREED that no objections need be (21) made by any party at the time of taking said (22) deposition, except objections as to the form of the (23) question or the responsiveness of the answer, which if (24) not made during the deposition are waived; but if and (25) when said deposition, or any portion thereof, is

## Page 7

(1) offered in evidence on the trial of this cause by any (2) party hereto, it shall be subject to any and all other (3) legal objections, such objections to be made at the (4) time of the tender, the same as though the witness were (5) on the stand personally testifying.

(6) IT WAS FURTHER AGREED that the witness shall sign (7) the deposition transcript before any notary public or (8) official authorized to administer oaths; and, at such (9) time, the witness has the privilege of reading over (10) said transcript and making any corrections that he/she (11) finds to be necessary, such corrections to be made

in (12) accordance with the Rules Civil
Procedure.

(13) IT WAS FURTHER AGREED that in the
event the (14) original deposition transcript
is not signed by the (15) witness within 20
days of receipt and filed at the time (16) of
trial or any hearing, that the original or a
(17) certified copy of said transcript may be
filed in court (18) and used herein as though
the witness had signed said (19) original
transcript.

(20) IT WAS FURTHER AGREED that after
said deposition (21) transcript has been re-
turned to the deposition officer (22) along
with changes, if any, made by the witness in
(23) accordance with the Rules of Civil Pro-
cedure, that the (24) original deposition
transcript, together with copies of (25) all
exhibits, will be delivered to MR. DOUG
DOUGHERTY

### Page 8

(1) for safekeeping and use in trial.

(2) IT WAS FURTHER AGREED that after
said deposition (3) transcript has been re-
turned to counsel in accordance (4) with
these stipulations and agreements, it will be
(5) treated by the parties hereto and may be
used herein (6) with the same force and ef-
fect as though all State (7) statutes and
rules relating to the taking and returning
(8) into court of depositions had been fully
complied with.

(9) -oOo-

### Page 9

(1) * * *

(2) V I D E O T A P E N O. 1

(3) * * *

(4) MARCO KALTOFEN, (5) having been
first duly cautioned and sworn upon his
(6) oath to tell the truth, the whole truth, and
nothing (7) but the truth, testified as follows,
to wit:

(8) * * *

(9) E X A M I N A T I O N

(10) * * *

(11) BY MR. DOUGHERTY:

(12) Q. Would you please state your full
name and (13) address for the record.

(14) A. My name is Marco Paul Johan
Kaltofen. I (15) reside at 5 Water Street in
Natick, Massachusetts.

(16) Q. You understand that you've been
designated (17) by the plaintiffs in this case
as an expert witness in (18) the area of
chemistry? Is that your understanding?

(19) A. Yes.

(20) Q. As you probably recall, my office
took your (21) deposition a little over a year
– a little over a year (22) ago. And I'm going
to try not to cover all of the same

ground, but I may just try to upd (24) some of that (24) information regarding
your background and experiences (25) and
so forth so we can get to the substance of
your

### Page 10

(1) testimony.

(2) First of all let me just ask you, generally
(3) speaking is your work completed in this
case?

(4) A. I believe my work is ongoing.

(5) Q. Okay. I'll talk to you more about
that (6) later on. You still have some other
things that you're (7) planning on doing,
then?

(8) A. Yes, sir.

(9) Q. Okay. As far as your education is
(10) concerned, you've got a Bachelor of
Science in general (11) engineering from
Boston University that you got in (12) 1981;
is that right?

(13) A. Yes.

(14) Q. And you did some graduate study
at (15) Northwestern in 1985?

(16) A. Northeastern.

(17) Q. I'm sorry, Northeastern. Did not
get any (18) type of graduate degree?

(19) A. No, sir.

(20) Q. Have you obtained any degrees
over the last (21) year and a half since we
deposed you last?

(22) A. No.

(23) Q. Okay. Now, your Bachelor of Sci-
ence in (24) general engineering, is that sort
of like it sounds; (25) it's a – it's a curriculum
that – that covers all the

### Page 11

(1) different disciplines within the field of en-
gineering?

(2) A. No, sir. General engineering is a
degree (3) where one primarily receives
what would be the (4) equivalent of a me-
chanical engineering degree, but also
(5) is allowed to major in one of the sci-
ences. I majored (6) in chemistry.

(7) Q. Your actual degree is in chemical
(8) engineering, though?

(9) A. No, sir. My degree is in general
(10) engineering.

(11) Q. I'm sorry, general engineering.

(12) A. And it allows you to combine a
mechanical (13) engineering and all of
the required courses for a (14) chemistry
major as well.

(15) Q. Does Boston University offer a
Bachelor of (16) Science degree in chem-
istry?

(17) A. Yes, they do.

(18) Q. Do they offer a degree in chemical
(19) engineering?

(20) A. No.

(21) Q. Anyway, you –

(22) A. As of 1981 –

(23) Q. Okay.

(24) A. – they did not.

(25) Q. You do not have a degree in any
field of –

### Page 12

(1) of chemistry; is that accurate?

(2) A. I have completed an American
Chemical (3) Society accredited chem-
istry curriculum, but my degree (4) is ac-
tually in general engineering. It's not a
(5) separate degree in chemistry.

(6) Q. The company that you work for,
Boston (7) Chemical Data Corporation,
what is the address of that (8) corporation?

(9) A. The address is the same as my
residential (10) address.

(11) Q. You're the president?

(12) A. Yes.

(13) Q. And you're – are you still the only
(14) employee?

(15) A. That's correct.

(16) Q. And you're the only shareholder?

(17) A. That's right.

(18) Q. And when you're not traveling, the
majority (19) of the work that you do is out
of your home?

(20) A. That's my primary place of
work, yes.

(21) Q. Let me update some information
with regard (22) to your past working expe-
riences with Mr. Hilliard (23) and – and his
firm. As I recall, you have been (24) working
with him since approximately 1992-1993
time (25) frame?

### Page 13

(1) A. That sounds right.

(2) Q. You worked with him on the Oxy
Chem case as (3) an expert?

(4) A. Yes.

(5) Q. And on the BFI case, the case
against BFI (6) and ASARCO and 20-some-
odd other defendants?

(7) A. Yes.

(8) Q. Did you also work with him on a –
on a (9) case that involved the Teco facility?

(10) A. Very briefly. I did a few days
work with (11) him on that case.

(12) Q. You testified previously, in addi-
tion to (13) those pieces of litigation, that
you also from time to (14) time went out and
did some sampling with the prospect (15) of
possibly that turning into some litigation; is
that (16) right?

(17) A. I did some other sampling that
wasn't (18) related to the cases you've
mentioned for (19) Hilliard & Munoz. I
honestly don't know where they're

(20) going to take that inform....ion. It (21) would be reasonable (21) to think that it might be part of litigation.

(22) Q. Do you know whether or not any lawsuits (23) have been filed in connection with any of that other (24) sampling that you did?

(25) A. Not offhand, no.

Page 14

(1) Q. And I think in your previous testimony you (2) indicated that there were approximately 50 – around 50 (3) times that you've gone out and taken samples for (4) Mr. Hilliard with the possibility of litigation being (5) filed?

(6) A. That number might be slightly high. There (7) may have been subcontractors who work with me from time (8) to time who have done some of that sampling.

(9) Q. How much have you been paid by (10) Mr. Hilliard's firm since you began working for him in (11) 1992?

(12) A. Well, of course, my corporation has been (13) paid. I would guess it's on the order of $150- to (14) 175,000. That number could be incorrect; I'm really (15) taking a stab at it. I know to date in '96 the total (16) I've received – the corporation has received from (17) Hilliard & Munoz has been a little over $50,000.

(18) Q. In 1996 what percentage of your time has (19) been spent working for Mr. Hilliard?

(20) A. About a third.

(21) Q. When you say the money has actually been (22) paid to your corporation, you being the only (23) shareholder and the only employee, that money is – is (24) going into your pocket, is it not?

(25) A. Well, actually, there are certain expenses

Page 15

(1) people have: laboratories, air fares, taxes, (2) accountants and so on.

(3) Q. Sure. But after you pay the expenses, (4) that – that's your money.

(5) A. That's right.

(6) Q. Would it still be accurate to say that the (7) bulk of the work that you've done here in the state of (8) Texas has been for lawyers?

(9) A. In the state of Texas?

(10) Q. Yes, sir.

(11) A. This year most of it has been. That's (12) right.

(13) Q. And would that also be true going back to (14) 1992?

(15) A. In Texas?

(17) A. Only in Texas, yes. Actually, I have to (18) think about that. Probably more than half.

(19) Q. With regard to the year – this year, 1996, (20) and you indicated that about a third of your time has (21) been spent working for Mr. Hilliard; is that right?

(22) A. Yes, sir.

(23) Q. What have you been doing with the other (24) two-thirds of your time?

(25) A. I've been working for –

Page 16

(1) MR. HILLIARD: This is a bag full of (2) tacquitos, hot and fresh, if anyone can't (3) wait for lunch besides me and Russ.

(4) A. Some of the other companies I've worked for (5) have been real estate development companies who have (6) asked me to examine properties for evidence of (7) environmental hazards. I've worked with a major (8) hazardous waste recycler doing technical writing for (9) that organization. I've worked with various property (10) owners, again, looking at potential environmental (11) hazards on their properties. I've also examined (12) manufacturing processes for individual clients in terms (13) of giving an environmental review of the performance of (14) those processes and products.

(15) Q. (By Mr. Dougherty) Have you done any work (16) in the last year, year and a half for any corporations (17) that manufacture chemical products or refined petroleum (18) products?

(19) A. I haven't worked for any – well, actually, (20) I've worked for corporations that manufacture chemical (21) products, but not for those that refine petroleum (22) products.

(23) Q. Which – which companies have you worked (24) for that are in the chemical manufacturing business?

(25) A. The largest is Molten Metal Technology of

Page 17

(1) Waltham, Massachusetts, which produces inorganic (2) chemicals from hazardous and solid wastes.

(3) Q. That's – so they're in the recycling (4) business, in fact?

(5) A. Yes. Well, it's – it's an interesting way (6) to put it. But I suppose ultimately they would be (7) classified as a recycler, although I believe it's just (8) as likely that their SIC code would show them as a (9) manufacturer.

(10) Q. They – they sell the products that

(12) A. Yes, sir.

(13) Q. – that they recycle?

(14) You do not have any academic appointments?

(15) A. No, sir.

(16) Q. Just to update the last time we talked – (17) and I know on your CV it indicates that you worked for (18) Greenpeace from 1984 to 1988. You told us that one of (19) the primary activities that you were involved in was (20) organizing environmental demonstrations; is that right?

(21) A. That was one of them, yes.

(22) Q. And you talked to us about several of the (23) occasions when you had been arrested for trespassing or (24) other things in connection with those demonstrations. (25) Have there been any of those – any more of those

Page 18

(1) incidents over the last year and a half?

(2) A. No.

(3) Q. Do you – do you consider yourself to be an (4) environmental activist today?

(5) A. No. Actually, I'll – I'll have to take (6) that back. I have been appointed by the selectmen of (7) the community in which I reside to chair the (8) Restoration Advisory Board to the U.S. Army Soldier (9) Systems Command, which is a super-front site in (10) Massachusetts. And I represent the – the community as (11) the co-chair of this board along with representatives (12) from EPA, our state environmental agency, and, of (13) course, the Department of Defense. I think in that (14) role as a – you would call that more community (15) politics – as a volunteer for the community. So I (16) guess that would probably be the closest thing.

(17) Q. Okay. You indicate on your CV that you're (18) a registered professional civil engineer in the state (19) of Massachusetts; is that right?

(20) A. Yes, sir.

(21) Q. What are the requirements of that (22) registration?

(23) A. You're required to have an accredited (24) education in engineering from an institution that gives (25) a four-year degree; you're required to have five years'

Page 19

(1) experience in responsible charge as an engineer; you're (2) required to pass two examinations, one in the (3) fundamental principles of engineering and a second (4) examination in the

in my case civil engineering.

(6)    Q. Has the majority of your work in the (7) engineering field been in the – in the field of civil (8) engineering?

(9)    A. Civil sanitary engineering. As an (10) engineer? Yes.

(11)    Q. Okay. Is there a similar accreditation in (12) the state of Massachusetts in the field of chemistry?

(13)    A. There is not.

(14)    Q. Do you have any type of professional (15) affiliations or certifications in the field of (16) chemistry?

(17)    A. I have been a member of the American (18) Chemical Society for approximately 18 years. We do not (19) have a certification program for chemists.

(20)    Q. What is – are there any requirements to be (21) in the – in that – that organization?

(22)    A. You're required to – to be a full member, (23) have an accredited degree or equivalent in chemistry.

(24)    Q. You're not an expert in the field of (25) toxicology?

Page 20

(1)    A. No.

(2)    Q. You're not an epidemiologist?

(3)    A. No.

(4)    Q. You're not a hydrologist or a (5) hydrogeologist?

(6)    A. I haven't worked in those capacities, but (7) that's part of being a civil engineer.

(8)    Q. Do you feel like –

(9)    A. It's not a specialty.

(10)    Q. Okay. Do you feel like you have expertise (11) in the movement of chemicals through groundwater?

(12)    A. Yes, sir.

(13)    Q. And what is the basis of that expertise? (14) Is it your education? your experience? what?

(15)    A. Both.

(16)    Q. Is there anything particular that you can (17) point to that gives you expertise in that field, or is (18) it just everything?

(19)    A. I wouldn't point to anything in particular (20) other than the years of experience working with (21) academic and field engineers on this area. I mean, it (22) is essentially the great bulk of what I do for a (23) living.

(24)    Q. Do you consider yourself to be an expert in (25) the field of the movement of chemicals through air, air

Page 21

(1) dispersion of chemicals?

(2)    A. Yes, sir.

(3)    Q. The last time we talked you – you (4) indicated you had done some air modeling back when you (5) were in school. Have you done any air modeling since (6) then?

(7)    A. No.

(8)    Q. What could you point to as the basis of (9) your expertise in the field of the movement of air – (10) movement of chemicals through air?

(11)    A. The basis of my expertise is more the (12) understanding and working with the environmental fate (13) and transport of airborne chemicals as opposed to the (14) development of air transport models. There's a (15) difference between, really, those two fields. One is (16) much more chemical in nature, the other is more – very (17) specific air modeling. And my expertise in that area (18) really relates to the behavior of chemicals in the air (19) as opposed to the more weather-centered approach and (20) the bulk-transport approach, I think, of some air (21) modelers.

(22)    Q. So you consider air modeling to be a (23) subspecialty within that – that field that you are not (24) an expert in?

(25)    A. I think it would depend on who you asked.

Page 22

(1) One would probably consider the other's the (2) subspecialty.

(3)    Q. Okay. Are there any publications of yours (4) that you could point to that relate to the movement of (5) chemicals through air?

(6)    A. Only work that I've done for individual (7) clients. And, unfortunately, that's not available for (8) publication in a great majority of the cases.

(9)    Q. Have you ever taken an air sample?

(10)    A. Yes, I have.

(11)    Q. I'm going to get to this in more detail (12) later. But have you taken any air samples in (13) connection with this case?

(14)    A. No, I have not.

(15)    Q. When was the last time that you were (16) involved in any air sampling?

(17)    A. Probably in the past few months I've done (18) air sampling for a client. Again that is looking at (19) site assessment and remediation problems on one of (20) their properties.

(21)    Q. Are there any publications of yours that (22) you can point to that deal with how to take and (23) preserve and interpret samples – air samples, water

,(24) samples, soil samples?

(25)    A. None that are peer review.

Page 23

(1)    Q. Any nonpeer-reviewed publications?

(2)    A. Undoubtedly. I have spent a good deal of (3) time in communication with, over the past decade and a (4) half, I'd say well over 500 clients in the area of (5) understanding and interpreting data from air, water, (6) groundwater, soil sampling, and so on. But, once (7) again, these aren't peer-reviewed publications, these (8) are written communications between myself and my (9) clients.

(10)    Q. I'm – I understand w at you mean when you (11) saw they're at peer reviewed. But are there some of (12) your writings that have been published in some type of (13) professional journal or magazine or anything of that (14) nature?

(15)    A. Not in this area, no.

(16)    Q. Over the last year and a half since we last (17) talked, have you done any additional work with the EPA (18) or the Texas state agency, the TNRCC?

(19)    A. Work? In – in what sense?

(20)    Q. Have they – have they retained you as a (21) contractor or subcontractor to do any work for them?

(22)    A. I have to think about that for a moment. (23) Because sometimes the – the contractual relations are (24) a little bit convoluted. But I don't believe so.

(25)    Q. Have you done any work for the EPA in

Page 24

(1) any – in any capacity over the last year and a half?

(2)    A. Only – oh, in the last year and a half?

(3)    Q. Yes, sir.

(4)    A. Pardon me for jumping on your questions.

(5)    Q. That's all right. We – we – we talked (6) about this last time, so I'm trying not to cover all (7) that again and just – just kind of update it. Since (8) we last visited about a year and a half ago, have you (9) done any work with the EPA?

(10)    A. No, sir.

(11)    Q. I presume that you were hired to work in (12) this case by Mr. Hilliard?

(13)    A. Yes.

(14)    Q. What is your compensation schedule?

(15)    A. It varies. It varies between $75 an hour (16) to a higher amount per day, which is about – I'd say (17) it works out to about twice that.

Exhibit B

# Become Your Own Pollution Private Detective

by Marco Kaltofen

For most of us, a home is the biggest investment in our lifetimes. To protect our investment we do a lot of checking before we buy. We look into schools and local hospitals. We time the commute to work. We compare property tax rates. We have the house fully inspected before we plunk down our cash.

Now imagine this. It turns out that you just moved down the street from a hazardous waste dump. Guys in moon suits are pulling rusty barrels out of the stream at the end of your cul de sac. How come the stream has that funny orange color? Is water supposed to smell like that? Best of all, your new neighbor says, "Gee, didn't you know about the dump? Everybody knows about the old dump."

This article is about how to keep this nightmare from happening, and what to do if it already has.

Pollution can come into your home in many ways. There could be lead paint on the walls, windows, or doors. Radioactive gases, like radon, may seep up from the basement. Your drinking water may be contaminated. Maybe you're being bathed in electromagnetic radiation from your toaster. Your dog's paws might be tracking in the pesticides you sprayed by your lawn. The nerve gas in your cockroach spray may be making your kids nuts. (Yes, of course it's nerve gas in that stuff. How else would it kill the little buggers so fast?)

Maybe you should panic. Lock yourself into your bedroom. Eat only pollen collected from daisies by organically raised honeybees.

Personally, I don't like panic. A better way to proceed is to make a simple inventory of potential hazards. Rank these hazards by how bad they are and how likely they are to happen. Check to see which hazards are actually present. (This step is easy for most people, but really hard for a very few. More on this later.) Fix the hazards that are fixable.

Finally, make a pact with yourself to forget about the stuff that is really minor or unavoidable. If you don't, then you'll probably just get depressed and eat too much ice cream or something. We all know about the horrible stuff in ice cream, now don't we?

Summing up:

Inventory and rank potential hazards, confirm which are present, fix some of them, go play golf. An unlikely few may find themselves fighting City Hall, or worse, around about step 3. The truly unfortunate may get their house egged at step 2. Step 1 can be completed by frequent visits to this website.

## Making an Inventory of Potential Hazards

They always said that most dangerous accidents happen in the home. Well, it turns out that this is true of toxic hazards too. Granted, it's not as bad as working at some smoke belching, waste dumping, radioactive toxic waste factory, but at least people get paid to work in them. This is about the stuff you run into just by living in your own house.

What kind of stuff do you run into in your own house? Take a look at the following partial list. By the way, this list is the reason why environmentalists are rarely invited to good parties. Environmentalists are the ultimate party poopers. They can tell you bad things about everything you'd want to eat, drink, touch, or whatever. We at Medaccess, however, are nice and fun people and we intend to give you the good news along with the bad. Still, first here comes the bad news.

A short list of household toxics will include:

- Lead in paint, both indoor and outdoor.
- Mercury based paint, which are however nicely resistant to mildew.
- Drinking water contaminants, especially for people who drink well water.
- Lead in drinking water, especially from lead soldered water pipes.
- Radon gas seeping up from the ground into your basement.
- Second hand tobacco smoke.
- Formaldehyde from insulation.
- Asbestos from your old boiler, pipe insulation, and floor tiles.
- Outgassing fumes from carpeting.
- Solvent fumes from dry cleaned clothes.
- Electromagnetic radiation from appliances.

Now let's go outside. Out here there is more of the same as the indoor stuff with a few extras thrown in. As you can see, lead is a big factor, especially for urban dwellers.

- Lead from outdoor leaded paint.
- Lead paint chips that landed in your garden and wound up in your tomatoes.
- Lead from traffic paints. (Those double yellow lines we get tickets for passing over).
- Lead from soil that came from old car exhaust, air pollution from local factories.
- Air pollution from autobody shops, paint shops, furniture strippers, gas stations.

- Landfill gases - History records show that the occasional house will actually blow up due to infiltrating explosive landfill gases containing you-know-what. (Rare but true).
- Air pollution from really big stuff like oil refineries, incinerators, dump sites, chemical plants, paper mills. (I can smell a paper mill 10 miles away, and so can everybody else.)
- Air pollution from mobile hazardous waste burners, meaning automobiles.
- Toxic vapors from polluted water. (What IS that smell at Niagara Falls?)
- Polluted streams.
- Dust from dumps, battery manufacturers, and metal smelters.
- How about Nuclear Power Plants? I don't know. Ask a Ukrainian.

Now let's go to the store. What's in all that stuff anyway? Even organic produce may sometimes contain traces of pesticides we've banned in the USA for years. DDT used in foreign countries gets stirred up by the wind from their eroding farm soils. It floats over the USA and contaminated rain dumps on Mr. MacGregor's (a made up name, apologies to any famous rabbits) organic carrot farm.

I suppose that's only fair since we still sell pesticides overseas that we think are too unsafe to use at home. Other stuff at the store includes acids, caustics, poisons and even radioactive stuff. (Yes, radioactive. They don't have to put that on labels yet.) We actually pay to bring that kind of stuff into our homes.

label has pictures of creatures with little x's instead of eyes. I haven't even begun talking about processed foods yet either. You know which ones I mean.

In short there's enough nasty stuff out there to make even the most claustrophobic among us move into biosphere II. What do we do about it though? How do we know what we are really exposed to and what do we do about it?

Well, the good news is that much of the book work has already been done. As you can imagine, some of our taxpayer dollars have been at work.

---

# Prioritizing your Problems: Making Molehills Into Molehills

A good rule of thumb for reducing toxic exposures is to remember the three L's. They are Lists, Libraries, and Lead. Lists we've talked about. Libraries, both physical and virtual, are where you make your lists. Lead is perhaps the biggest hazard many homeowners & renters face.

Lead exposures from paints, soils, drinking water, and industrial releases may be the most important thing you can do to reduce your risk levels, with the possible exception of quitting smoking. The primary beneficiaries of lead abatement will likely be your children and any childbearing persons. Adult males will also reap some benefits, but I am too shy to describe them. Ask your doctor.

Here's an important note about removing lead and another common household hazard, asbestos. Get professional help. Removing lead and asbestos yourself can result in worsening things by spreading contaminants throughout your home. It may or may not even be legal in your state.

State and local agencies may have assistance programs. (Burdensome government intervention.) However, some agencies may actually penalize you for reporting your own lead/asbestos problems.



The next things on the list that bear scrutiny are radon hazards, drinking water hazards, and bad neighbors. I don't mean barking dog type neighbors either, I mean wicked bad neighbors like you read about in Greenpeace newsletters.

Radon is another one where the government has a lot of free stuff for you. Write, e-mail (Ha! Good luck), or call the Environmental Protection Agency for information on radon.

Drinking water hazards include lead from your pipes, chlorination by-products, solvents and especially dry-cleaning solvents, and other contaminants especially for well water. If you get your water from your municipality, congratulations, they have to give you free test results. (Except for lead from your own pipes. Still, this test is cheap.) If you get your water from your own private well, then rugged individualist that you are, you have to pay for testing it yourself. If you drink bottled water, you have to beg your bottled water company for data. Please note that there have been some striking examples of bottled water occasionally being quite inferior to municipal waters.

- Access to the Internet. (Your virtual library.)
- An actual Library.
- A car or bike (for visiting plant sites for "windshield surveys". Camo paint & blacked out windows are optional).
- A fat notepad or hard drive.
- Local street atlas.
- USGS 7.5 minute maps.

Advanced tools will include:

- Bottles (for what I call corporate urinalysis).
- Safety gear like plastic gloves, safety glasses, and a healthy fear of the unknown.
- About $25 worth of chemicals.
- Access to free advice like college professors & extension services.

Really advanced tools:

- A grant writer.
- Bail money.
- A dog *.

* "Why am I walking around this factory at night Mr. Police Officer? Well, I was walking my dog Spot".

Other Good Resources:

- A Practical guide to Preventing Lead Poisoning by I. Kessel & J. O'Connor, 1994, Greenworks Press, 160 Second Street, Cambridge, MA 02142 (Cheap)
- The Green Consumer Guide, J. Markowitz
- The Truth About Where You Live, B. Goldman
- Hazardous Chemicals Desk Reference, Sax, VNR (Not Cheap)
- HACH Chemical Supply Catalog, Loveland, CO (Free)
- Lab Safety Supply Catalog, Janesville, WI (Free)
- The US Environmental Protection Agency Phonebook, USEPA, Wash. DC (Free)
- The Yellow Pages (Free)
- US Geological Survey 7.5 minute maps of your locality (Cheap)

---

Once you have collected your tools of choice, let's get started. Open your notebooks, pick up your number two pencils, fire up your water-cooled super modems and let's begin.

Start with your local Yellow Pages, a local street atlas, and a copy you've made of a United States Geological Survey 7.5 minute map of your area. These 7.5 minute maps contain wonderful details such as the outline and location of railroad tracks, streams, lakes, hills, homes, and so on. They are available from the USGS (url: www.usgs.gov) or from a fee-charging map service such as Map Express at 800-627-0039.

Look through the yellow pages and use the atlas to plot the following locations on the 7.5 minute map. Also, make a note of each facility in your notepad or on your computer. Color coding each category is recommended.

I) Potential threats to groundwater (well water supplies).

- Dry cleaning establishments.
- Auto repair shops.
- Gas stations.
- Fuel companies.
- Landfills.
- Waste Transfer Stations & Hazardous waste treatment/storage facilities.
- Large manufacturers including: chemical, oil, metal working, furniture and others.
- Power Plants.
- Industrial parks

II) Pesticide users.

- Larger farms, especially monocultures.
- Railroad tracks (already plotted).
- Lawn care freaks (too many to plot).
- Power line right of ways (already plotted).
- Golf courses (already plotted).

III) Potential air polluters.

- Major thoroughfares (already plotted).
- Everybody in category I.
- Incinerators - municipal & hospital.
- Furniture strippers.
- Drinking water treatment plants.
- Paper mills.

- University & college laboratories.
- Testing & research laboratories.
- Printers & photo developers.
- Industrial/commercial launderers.

IV) Potential surface water polluters.

- Everybody in categories I, II, III, IV

You have now produced a map of the great majority of local pollution sources. Congratulate yourself, because if you had hired an engineering company to do this for you, you would have spent up to $1000.00 already. Your map is probably pretty full. It should be clear why you started with a copy of the USGS map. Now we start winnowing.

Eliminate all locations which are only pick up and drop off centers. This will apply mostly to places like printers, photodevelopers, and dry cleaners. Although industrial and garbage waste transfer stations are also pick up and drop off sites, keep these on your list. Somehow they usually manage to find a way to pollute.

# Site visits

If you have a map and a list of manageable size, this would be a good time to visit each site by car, bike, or on foot. Look for a lot of pipes that don't seem to go anywhere except into the local environment. Pipes that stick up in the air or into the nearest ditch or stream are a dead giveaway.

Make a sketch of the location if necessary. Visiting around 8-9 am, noon (lunch time) or 4-5 p.m. is a good idea. These are typically shift changing times when a lot of junk gets dumped.

Some polluters will dump into the sewers via underground pipes. Draw a straight map line between the plant and the nearest public street and look for lots of manholes (or their nonsexist version, sewer covers). Note the letters on the covers. Telephone, cable, and sewer pipes all have distinctive lettering such as Tel., DPW, Elec. and so on. You're looking for the ones marked whose letters end in PW and WD standing for Public Works or Water Dept.

Temptations to lift up manhole covers should be abated by remembering that: They are heavy and will lop off your fingers if you are not careful. The holes can be frighteningly deep. (I saw one on a quiet street lifted to reveal a 150 foot deep chasm that could fit a decent football game on the bottom.) Toxic gases and liquids may be present. Also, there are poops down there, millions of them.



offending plant. There you may find a pipe disgorging Lord-knows-what into the water. Once again, note that if the Lord-knows-what was good for you, they wouldn't be dumping it in the water, so keep dry. Keep good notes.

Look for barrels of nasty stuff out back. Look for discolored soils and stream beds near pipes and such. Lots of fresh gravel spread on the back forty for no apparent reason usually means something bad is underneath. After all, gravel is expensive and rarely wasted.

Use your nose. Does it stink? This type of clue is too often overlooked. Is the overall atmosphere one of grime and unkemptness? Does the place look like it is well past its heyday? Is the road sign hidden or rusted, or is it clean and proud? Decaying operations are often the dirtiest ones. Are there a lot of security guards, gatehouses, or barbed wire?

Are there bright orange wind socks at high points of the plant? These are used to tell the workers which way to run if there is a release of toxic gases. Hint: Run upwind! Does the plant have

data on surface water bodies you find in your area. The detail and quantity of data on water bodies is stunning.

At the EPA homepage, use the EPA's Envirofacts link to get to the TRI menu. TRI stands for Toxics Release Inventory. It is a database containing self reported toxic waste storage and discharge for manufacturers and federal facilities, such as military bases. It is the best laundry list of chemical discharges one can find anywhere.

After looking at TRI, try checking the CERLIS and RCRIS databases. CERCLIS is a simple and brief listing of Superfund, i.e. the most dangerous of the nation's dumpsites. RCRIS is a directory of hazardous chemical users, including both the dangerous and the benign facilities.

Much of the same data is presented with more of an activist slant at the Right to Know Network. Their databases also include an easier to use interface and census and community related data.

Compare data from these to sites on the list you've made from your phone book and site visits. While you will fill in some gaps, you'll find that you have already discovered most of the potential polluters before you got on the web. You will also be able to confirm what your nose told you during your visits.

Still stumped? Here's a hint for places where you have trouble finding information. Try calling them up. For big companies, almost all of them have 800 numbers where you can ask them questions on their dime.

If this seems like asking the fox how the chickens are doing, keep in mind that most government databases are based upon voluntary data submissions. By voluntary I mean in the same way that tax payments to the IRS are made voluntarily, instead of going to jail. It just happens that the USGS has a lot fewer auditors than the IRS does.

## A few notes on advanced detective techniques

The World is full of people who think that they deserve a sample of your urine. I'm talking about health insurers, police, prospective and current employers and so on. Isn't it time we turned the tables? We, as citizens, can do something called corporate urinalysis.

If some polluters have a little pipe going into our water, shouldn't we be able to get a little information from their excretions? This is where the truly curious can don their safety goggles and rubber gloves and collect a bottle full of wastewater for analysis. Please note, if the stuff was healthy for you they wouldn't be dumping it into the water like they do. Treat it like its radioactive, because it might be.

It's good to have a deal made in advance with a friendly laboratory type person, like your buddy at the local college with access to analytical equipment. Lab testing costs big bucks, so check to see if any of the thousands of taxpayer supported labs will do the testing for you.

Back at EPA's homepage you can link into their Volunteer Citizens Monitoring Program. Issues like what to test for, and how to do it safely are discussed. Some other hints are available from the Environmental Technology Education Center.

## Really Advanced Notes

There are a number of organizations which do nothing but things just described here to monitor and report pollution violators. Groups such as Baykeeper in San Francisco Bay and Riverkeeper on the Hudson River have made it a full time occupation, supported by grants, to turn in polluters who were

not kind enough to "self-report".

About the bail money in the really advanced tools list; you won't need any if you respect posted property. If it's not posted then you're not trespassing until you refuse to leave when asked. But you know how it is, eh? "Tell it to the judge." (And don't let your dog lick any of those funny colored puddles.)

Should you find new evidence of pollution activities, you needn't limit your actions to simply marking a map, or not buying a certain property. Remember that the power of the Internet is that it is two-way communication. Pass on your data to the organizations, agencies, and new media here on the net. After all, it's one thing to call up a polluter and complain to them about what you've found. It's another thing altogether when they read about themselves in the morning paper.

For more information please contact <u>Marco Kaltofen, P.E.</u>, President of <u>Boston Chemical Data Corp.</u>

[<u>Main Menu</u>] [<u>Biography</u>]  [<u>Kaltofen Home Page</u>]  [<u>More Natick Pages</u>] [<u>Health & Environment Resources</u>]

Copyright (C) <u>MedAccess Corporation,</u> 1996, All Right

Exhibit C

Search

ONLINE:   The RTK NET Newsletter, Vol.  3, No.  4, Spring 1994

TALES FROM OFF-SITE: NEW REPORT DETAILS TRANSFERS
by Alair MacLean and Rich Puchalsky
In June of 1992, a Rhone-Poulenc factory in Martinez, California,
exploded. Sulfuric acid had spilled and caught fire when it came in
contact with hot machinery. Two workers were critically injured.
One later died.
A year later, Gibraltar Chemical Resources in Winona, Texas, where
waste chemicals are injected deep underground, was ordered to clean
up contaminated groundwater on its site. By the fall, Gibraltar's
environmental problems had grown so large that the state ordered
the company to stop doing business temporarily.
What do these two facilities have in common? Each is among the top
facilities receiving transfers of toxic chemicals according to
information contained in the Toxics Release Inventory (TRI).
Earth Day Events
In April of 1994, as it had for the last five years, the
Environmental Protection Agency released its annual report on the
fate of toxic chemicals used in manufacturing, the TRI. The
approximately 300 chemicals listed on the TRI are considered among
the most dangerous to human health and the environment. For
example, many can cause cancer. This year, as in the past, the
media, the public and regulators focused on the pounds of toxic
chemicals emitted from manufacturing facilities around the country.
Press releases compared this year's reported emissions to last.
Discussion centered on whether facilities or geographic regions had
reduced chemical emissions or not.
But the Toxics Release Inventory tells another, little-noticed
story as well. Contained within manufacturers' yearly reports are
records of more than 80,000 transfers of chemicals to what are
called off-site facilities: recyclers, landfills, and incinerators.
In all, the approximately 23,000 manufacturers sent their toxic
chemicals to more than 5,000 off-site facilities. And, if history
is any guide, these facilities may pose health and environmental
dangers in the future. As of 1991, at least 112 sites on the
federal Superfund list had previously been engaged in recycling
hazardous waste.
Manufacturers reported releasing 3.4 billion pounds of toxic
chemicals to the air, land, and water in 1991. But they sent just
as many pounds of chemicals to be disposed at other facilities. In
1991, manufacturers reported more than 3.4 billion pounds of
transfers to off-site destinations.
Some past analyses have looked at the aggregate number of pounds of
toxic chemicals sent off-site at the state-level. Yet, so far, no
one has compiled a national record of the actual sites that receive
these toxic chemical shipments. The difficulty of collating and
correcting the information has presented a formidable obstacle. And
there is a general perception that transferring chemicals "solves"
the pollution problems associated with releases.
But these transfers may just move short-term accidents and
long-term contamination from one site to another. And the towns
that host off-site destinations end up serving as a dumping ground
for the problems of industrial production.
OMB Watch and Unison Institute undertook the task of analyzing
off-site transfers. Our report, Where the Wastes Go, represents
the first examination of the top facilities around the country that
receive shipments of TRI chemicals in waste. (For a previous
examination of the destinations by state see Nancy Lilienthal,
Trading Toxics Across State Lines, INFORM, New York, 1990.) Using

the 1991 TRI data, we have prepared a list of the off-site
destinations that receive the greatest poundage of transfers of TRI
chemicals from manufacturers. The facilities receiving TRI
chemicals are named and ranked.
The top 40 facilities account for 1.7 billion pounds, 48 percent of
all chemicals transferred. (Less than 1 percent of the facilities
receiving off-site transfers account for only slightly less than
one half of all TRI transfers.) The first, third and eighth largest
recipients of TRI chemicals are Rhone-Poulenc facilities in
Hammond, Indiana, Carson, California, and Baton Rouge, Louisiana.
The second and seventh largest recipients of TRI chemicals are
General Chemical facilities. A Timken facility in Canton, Ohio, is
the fourth largest recipient of TRI chemicals, and a Coulton
Chemical facility in Oregon, Ohio, is the fifth largest recipient.
A Horsehead Resource Development facility in Palmerton,
Pennsylvania, is the sixth largest recipient. Gibraltar Chemical in
Winona, Texas, and Petro-Chem Processing in Detroit, Michigan,
occupy the number nine and number ten spots. These top ten
facilities receive more than one quarter of all the TRI chemicals
sent off-site.
The report also identifies the largest recipients of TRI chemicals
within specific categories, such as landfills and incinerators. The
landfill receiving the most TRI chemicals was operated by Pennfill
in Taylor, Michigan. The largest incinerator was operated by
Rollins in Baton Rouge, Louisiana. The company receiving the most
TRI chemicals for energy recovery was Arco Chemical in Channelview,
Texas. The facility receiving the most pounds of TRI chemicals to
be injected underground was Gibraltar in Winona, Texas. Rhone
Poulenc's facility in Hammond, Indiana, was number one on the list
of facilities receiving TRI chemicals for acid regeneration.
The report looks in detail at six companies that dominate selected
disposal or recycling methods: incineration, landfilling,
underground injection, energy recovery and acid regeneration. These
destinations for off-site transfers of TRI chemicals share a
history of short-term accidents and long-term contamination.
Recipients of TRI transfers have allegedly contaminated water
supplies:
In New Castle, Kentucky, a 1992 enforcement action by the EPA of a
Safety-Kleen energy recovery facility, the fourth largest facility
in terms of TRI shipments, alleged that the company had
contaminated the Bartlett Fork Creek with hazardous waste.
In Carlyss, Louisiana, based on inspections that began in 1988, the
state has charged that the Chemical Waste Management landfill,
number six in terms of TRI shipments, allowed hazardous wastes to
contaminate the nearby ground and water.
In Winona, Texas, in 1993, the state ordered the Gibraltar Company,
operator of the largest underground injection facility, to clean up
contaminated groundwater.
Recipients of TRI transfers have had potentially dangerous
accidents:
In Carlyss, Louisiana, in 1988 and 1989, the Chemical Waste
Management landfill experienced a series of eight fires that the
company failed to report.
In Martinez, California, in 1992, the Rhone-Poulenc acid
regeneration facility, number 9 in terms of the weight of TRI
chemicals received, suffered a serious accident involving sulfuric
acid. Two workers were critically injured. One later died.
In Winona, Texas, in 1993, the Gibraltar facility had a chemical
reaction in a 15,000 gallon tank that released a toxic plume.
And, in the same year, Gibraltar executives failed to report
another chemical accident until the day after it occurred.
Recipients of TRI transfers have allegedly received illegal waste
shipments:
In Deer Park, Texas, a Rollins Environmental Services facility, the

number two incinerator in terms of TRI shipments, evidently
received radioactive waste shipments during the eighties.
In Emelle, Alabama, in 1987, the Chemical Waste Management
landfill, number ten in terms of TRI transfers, apparently
illegally stored and transferred Agent Orange.
Facilities receiving TRI chemicals have been ordered closed by
local and federal regulators:
In Baton Rouge, in 1985, the state of Louisiana ordered Rollins's
incinerator, number one in receipts of TRI chemicals, closed due to
pollution problems. The incinerator is one of the few businesses
ever denied a tax incentive by the state because of pollution
problems.
In Manati, Puerto Rico, in 1992, the Safety Kleen facility, the
sixth largest incinerator in terms of TRI chemicals, had stored
more than 800,000 pounds of excess toxic waste on-site. In
addition, the facility was storing more than a million more pounds
of hazardous waste in un-permitted tanks on the north and south
coasts of Puerto Rico. The facility had to close temporarily and
the Puerto Rican Environmental Quality Board recently fine
Safety-Kleen more than $1.4 million dollars.
In Winona, Texas, in 1993, the Environmental Protection Agency
officially revoked the Gibraltar Company's right to inject
hazardous waste into one of its two underground injection wells
because of an 800 foot gap surrounding the well.
And, in the same year, the state ordered Gibraltar to temporarily
stop receiving hazardous wastes.
At least one of the companies has had prior involvement with a
Superfund site:
In Bridgeport, NJ, the Rollins incinerator, number three in terms
of its receipt of TRI chemicals, has been prosecuted by the federal
government as a Potentially Responsible Party in a couple of
Superfund cases. In a 1988 lawsuit, the company was found to be a
Potentially Responsible Party in the contamination of at least one
Superfund site: the Kin-Buc Landfill in Edison, NJ.
Many of the actions described above represent a failure of
compliance on the part of facilities that receive TRI chemicals. To
prevent the top recipients of TRI transfers from becoming the
Superfund sites of the future, greater attention should be focused
on these sites.
Shippers of TRI chemicals should try to reduce their use of toxic
chemicals in the first place. Toxics use reduction would limit the
number of pounds sent to off-site facilities. Additionally,
reduction of the use of toxic chemicals would lead to a decrease in
emissions of toxic chemicals as well.
Recipients of TRI chemicals should have to report their own
releases and transfers of the chemicals, in order to increase
accountability. Current law only covers certain large manufacturing
facilities. In 1991, these manufacturers reported that they sent
more pounds of chemicals off-site than they emitted directly to the
environment. Yet, the recipients of these off-site transfers do not
now have to report their own emissions to the environment.
Requiring landfills, incinerators and other hazardous waste
recycling and disposal sites to report their emissions of TRI
chemicals would greatly increase the accountability created by the
Right-to-Know.
Recipients of TRI chemicals should publicize their plans to prevent
chemical accidents, as well as back-up plans for responding to
chemical accidents should they occur. Local Emergency Planning
Committees, established by the law that created the TRI, could
theoretically take an active role in requiring manufacturers to
prepare accident prevention plans and in making those plans
available to the public. More recently, the Clean Air Act
Amendments established the first framework for making corporate
plans for chemical accidents publicly available. Under the current

draft of the regulations, manufacturers must allow the public to
see their assessments of the worst-case accidents. Hazardous waste
landfills and incinerators pose dangers as well. They should also
be required to enlist the public in planning for accidents.
Shippers of TRI chemicals should monitor the regulatory and
environmental histories of the companies to whom they ship waste.
The Superfund ensures that companies who ship waste that ends up in
an uncontrolled waste site must bear some share of the burden of
clean-up. With this expanded definition of liability, it is in TRI
shippers interest to monitor the fate of chemicals shipped
off-site.

EPA should ensure that the facilities receiving TRI wastes can
legally handle those wastes. While the largest recipients of TRI
transfers are likely to have permits to receive such waste. A
number of facilities that may not actually have permits to receive
TRI chemicals.

EPA should include examinations of off-site recipients in future
analyses of the Toxics Release Inventory. Through its annual report
on TRI chemicals, EPA each year spotlights manufacturers' releases
of toxic chemicals. But the agency has not consistently examined
the recipients of transfers. In the future, EPA should include
lists of the names of off-site destinations in its analyses of TRI
data.

Alair MacLean works for OMB Watch and Rich Puchalsky works for the
Unison Institute. This article is an excerpt from their recent
report "Where the Wastes Are: Highlights  from the Records of the
More Than 5,000 Facilities that Receive Transfers of TRI
Chemicals." To receive a copy of the full report, contact OMB
Watch.

YOU SAY YOU WANT A REVOLUTION
In the early eighties, it was widely rumored that computers would
supplant books, newspapers, paper files and other symbols of our
retrograde information culture by the end of the decade. The
continued clutter in most offices indicates otherwise. And if the
number of books about how to get onto the Internet is any evidence,
computerization alone may keep the paper industry in business.



RTK NET itself will provide a gateway to the information highway.
Here's an overview of a small selection of the plethora of new
guides to this new technology. Two of the four manuals label their
intended audiences as "dumb" right in the title, while the other
two take a more neutral stance. But the information contained in
any of the four will provide new users with many of the tools
necessary for participating in the information revolution.
DOES ANYBODY KNOW WHAT TIME IT IS?
Because the revolution takes place in speeds measured in the
thousandths of a second, timeliness is key. Ed Krol's Whole
Internet User's Guide and Catalog was first published in 1992 and
has been printed with minor corrections since.  This otherwise
excellent introduction to the online world therefore does not refer
to certain important functions, such as a searching facility called
Veronica. At the other end of the spectrum, the Big Dummy's Guide
to the Internet was last revised in February 1994. This guide, for
now, is only available through the Internet from the Electronic
Frontier Foundation. This presents something of a catch-22: you
must have at least rudimentary networking skills in order to get
this beginner's manual. According to the introduction, the Big
Dummy will be published in June of 1994. If you can hold out that
long, the printed version will probably be the most up-to-date
overview of the Internet.
It has become something of a cliche that the Internet is anarchic
and confusing. So any book that provides a semblance of a structure
gives the novice an advantage. Krol's elucidation follows the

Internet's logical development, beginning with a detailed history
of the network and moving through the various functions, from the
simplest to the most complex, from telnet to the World-Wide Web.
After reading this guide, you feel you understand how the Internet
was constructed. The Big Dummy book follows a more practical
"how-to" structure.  It starts not with the Internet's beginnings,
but with a beginner's beginning: how to get access. And the
description really takes off with a discussion of electronic mail
(e-mail) the function that most commonly introduces users to
networking.

INSIDE OUT

The authors display radically different attitudes toward their
shared subject. The Whole Internet, with its elaborate treatment of
the birth of the network and detailed descriptions of protocols, is
a little dry and computer specific. As you might expect, The
Internet for Dummies affects a sarcastic tone. One of their
graphics indicates which parts of the text are "Nerdy technical
discussions you can skip if you want." The frequent jokes and
tongue in cheek descriptions imply that we "Dummies" are actually
smarter than the nerds who set up the computers. This approach does
yield useful information not as readily available in less critical
books. For example, Internet Relay Chat "seems to be mostly
frequented by bored college students." Big Dummy's inhabits the
middle ground, combining a free-flowing prose style with sometimes
technical information. The Whole Internet is written from the
inside looking out, while the dumb books convey the vantage of the
outside looking in.

NOW WHAT?

But once you, the novice, are actually inside--on the net--then
what? The Whole Internet contains the best catalog of the "how-to"
books. Big Dummy's includes references to different services as
they are mentioned in the text. The selection of services is
strangely idiosyncratic, including a disproportionate number of
sites in Cleveland. To get a real sense of the vastness of the
online world, however, you'll want a book like The Internet
Directory. The short, mostly conceptual descriptions of the
different services won't get you started, but once you have an idea
of how to navigate the net, this Directory includes literally
thousands of addresses that tell you where to go.
You will probably want to rely on more than one reference. Read a
number of these books in succession and you will notice small, but
significant, omissions. Big Dummy would have you download a
"README" or help file when such a usually short and necessary file
would best be read online, as described by Krol. But, you say, I
don't want to read four books just to get online. Well, then start
with Big Dummy's for the latest on technique, and, if you feel like
it, add The Internet Directory for a guide to the resources of the
online universe.

TO ORDER:

The Whole Internet User's Guide & Catalog, contact O'Reilly &
Associates at (800) 998-9938 or "nuts@ora.com."
The Internet for Dummies, contact IDG Books Worldwide at (415)
312-0650.
The Internet Directory, in major bookstores.
The Big Dummy's Guide to the Internet (forthcoming from MIT Press),
FTP to eff.org.

FOLLOW-UP: CORPORATE BUYOUTS OF COMMUNITIES
In the Winter 1993 issue of ONLINE, we took a look at a new trend:
corporate buyouts of communities. Here are some recent developments
in relations between corporations and communities.
When the vegetables in her garden started dying, Janice Dickerson
decided to complain to Georgia Gulf, the nearby chemical company.
"If something like that is happening with vegetables," says

Dickerson, "you have to wonder what's happening to the people." At
the time, Dickerson was a resident of Reveilletown, a small
community near Baton Rouge. In 1989, a decade after her first
complaints and a law-suit later, Dickerson and fifteen other
families received a settlement that provided them with money to
move to new homes. For the dozen or so families who did not join
the suit, Georgia Gulf built a subdivision called Reveilletown Park
two miles from the factory fenceline. Today, only two small houses
remain to mark where the 150 black residents of Reveilletown once
lived.

The Georgia Gulf purchase of Reveilletown was one in a series of
corporate buyouts of black communities in the Baton Rouge area.
Just months after the Reveilletown settlement, Dow Chemical offered
to relocate the residents of Morrisonville. In 1991, Placid Oil
settled a law suit with the residents of Sunrise by agreeing to pay
for a move. And Exxon executives continue to purchase property near
their plant in Baton Rouge.

"It's just generally not compatible to have chemical plants and
residences next to each other," says Beverly Gholson, a lawyer with
Georgia Gulf who helped negotiate with Reveilletown residents. "If
we were going to locate a new plant, we wouldn't do it near
residences. Very few chemical companies would."

Yet, some chemical companies and other potentially dangerous
facilities continue to choose residential areas. In 1989, the year
of the Reveilletown buyout, the Formosa company announced plans to
build a large-scale rayon factory in one of the few areas along the
Mississippi River between Baton Rouge and New Orleans that contain
no petrochemical plants. To observers, the company's purchases of
homes in Wallace, a community that had been founded by former
slaves after the Civil War, followed a distressingly familiar
pattern. In October 1992, the company announced that it would not
move forward with the plant. "But that area is slated for
development one way or another," says Audrey Evans of the Tulane
Environmental Law Clinic, which assisted Wallace residents in
fighting Formosa.

The loss of historically black communities to the vagaries of the
chemical industry has focused attention on the fight for
environmental justice. "Our situation helped bring attention to the
plight of poor, rural communities," says former Reveilletown
resident Dickerson. "Folk told me they didn't even know we were
down there." Dickerson recently received funding from the state
Department of Environmental Quality to combat environmental
injustice, which, she says, has led to the rash of buyouts in the
first place. And she hopes to stop the local government from
placing a sewage treatment plant in a predominately black
neighborhood just three miles from where she moved.

In 1990, spurred in part by stories of corporate buyouts, the
Louisiana Advisory Committee to the U.S. Commission on Civil Rights
began to examine whether environmental racism might be an issue in
the state. Last fall, the commission issued its report. The report
echoes Georgia Gulf's Gholson's observations that residences and
chemical plants are incompatible. The authors recommend that
Louisiana adopt zoning regulations requiring companies to ensure
buffer zones around factories.

But this recommendation has been made before to no avail. In 1984,
a state Supreme Court decision required Louisiana to develop
land-use planning guidelines.  Paul Templet, head of the state
Department of Environmental Quality from 1988 to 1992, expresses
frustration with the pace of change. He says that industry
representatives have long opposed any government control. "If the
industry thought long-term, they wouldn't be opposed to land-use
planning," says Templet. "But the kind of guy you get running a
plant is only concerned with next quarter's bottom line and that's
not long-term."

WHAT'S AHEAD FOR THE RIGHT-TO-KNOW
by Alair MacLean
OMB Watch

Think of the Toxics Release Inventory as a tax code for
manufacturers. Then you'll get a sense of how industry executives
feel about the Form R: the IRS form 1040 of pollution. If anything,
industry antipathy for this yearly ritual may be even greater than
yours for paying taxes. But, while you may grumble about how much
you owe, corporate executives have trade associations who can lobby
the regulators on their behalf.

The Chemical Manufacturers Association wants to redefine
underground injection by moving certain fields from one part of the
form to another. Small businesses, like the National Soft Drink
Association, would like to avoid having to fill out the form
altogether.  These, and other industry groups continue to plead
their cause to the Environmental Protection Agency, which designs
the form, and the Office of Management and Budget, which approves
it.

In the last six months, OMB's Office of Information and Regulatory
Affairs has logged approximately thirty meetings with
non-governmental representatives, according to Dan Cook of OMB
Watch. Three of these meetings, one tenth the total, concerned
potential changes in the requirements for reporting to the Toxics
Release Inventory. In early February, OIRA head Sally Katzen met
with industry advocates of the proposal to redesign the form. And
in mid-April, OIRA hosted a meeting to discuss exempting small
sources from reporting. (In December, OMB Watch and other
environmental groups met with OIRA staff to advocate adoption of an
EPA proposal to increase the number of chemicals included in the
Inventory.)

The meeting regarding small sources was just the latest in a series
of actions initiated by the Small Business Administration almost
three years ago.  In August 1991, the SBA petitioned EPA to
establish thresholds that would exempt facilities that release
small quantities of TRI chemicals from reporting. "It did not make
sense for these companies to be spending hundreds of millions of
dollars a year to be cleaning up problems they didn't have," says
Kevin Bromberg, who drafted the petition and is now counsel for the
Small Business Coalition for a Responsible TRI policy. In February
1992, the American Feed Industry Association submitted a similar
petition requesting that animal feed producers not have to report
to the TRI. The EPA now predicts that the small source exemption
rule will be published for comment, following OMB review, sometime
in June 1994.

Under the current version of the TRI, manufacturers do not have to
report releases of chemicals as long as they make or use less than
certain specified amounts.  Under the SBA proposal, if
manufacturers released less than a certain amount, they would not
have to report releases. For example, if a facility were releasing
less than 5,000 pounds of ammonia in a year, the facility would not
have to report any releases of the chemical.  EPA analysis prepared
in January 1994 showed that such an exemption would reduce the
total amount of releases and transfers reported to the agency by .8
percent. But more than 20 percent of the total waste reported to
EPA would be excluded by this definition.

Environmentalists have insisted from the start that regulators must
ensure that only legitimately small sources be exempt. Paul Orum of
the Working Group on Community Right-to-Know also advocates that
EPA monitor exempt facilities annually. "We would feel that we had
won a victory if there had to be certification and only releases
below ten pounds were exempted," says Orum.

For the facilities that still have to report there may be changes
up ahead. Sometime in the fall of 1994, EPA staff hope to circulate
a revised and streamlined Form R. If the CMA has its way, that new

form will ask manufacturers to report toxic chemicals disposed in
certain underground injection wells in a section of the form titled
"Source Reduction and Waste Management Activities," rather than the
section that details releases to the environment. "Where industry
is coming from is they want the Class I wells, the supposedly safe
ones, to be considered not a release," says EPA's Anning Smith.
Class I wells, in contrast to other injection wells, are required
not to contaminate drinking water.
Both battles--who reports and how they report--concern how the TRI
is to be defined and what it will cost. Industry representatives,
like Kevin Bromberg, claim that reporting to the TRI unfairly
stigmatizes facilities. And EPA has estimated that a small source
exemption could save industry as much as $66 million. As you
probably expected, filing the 1040 of pollution has a price tag.



ACT LOCALLY, ACT GLOBALLY
BACKGROUND INVESTIGATIONS
In 1983, Marco Kaltofen founded the Boston Chemical Data
Corporation in Wellesley, Massachusetts, to provide environmental
research services to community groups. Kaltofen worked for the
National Toxics Campaign between 1988 and 1993. Before that he
worked for Greenpeace.
Boston Chemical Data has done everything from performing laboratory
tests to helping prepare testimony. The staff have even drilled
monitoring wells in the communities. They have worked in Texas,
Ohio, New Jersey, New York, Pennsylvania, Eastern Europe, and
Russia.
Kaltofen uses RTK NET "in most cases." He spends two to three hours
a week on RTK NET. Most commonly, he compares the TRI emissions of
similar companies. If a community group, for example, is planning
a suit against a large corporation, he will use RTK NET to get
information about the environmental record of all of the company's
facilities. He also uses Permit Compliance System Data, FINDS, and
the Council on Environmental Quality reports available in summary
form on the network. With these sources of information he is able
to begin to compile a corporate or facility profile.
For more information about the Boston Chemical Data Corporation,
contact "kaltolfm."
ALL FOR ONE AND ONE FOR ALL
Since 1989, Paul Orum has been the coordinator of the Working Group
on Community Right-to-Know, a network of environmental and public
interest groups.  US-PIRG has been the host organization for the
Working Group for the last five years.  Orum is the Working Group's
only paid staff member.  Today 2 dozen national groups and 1500
state and local groups are affiliated with the working group.
Recently the coalition has focused on expanding the Right-to-Know
to include federal facilities, more chemicals, and chemical use
information.  Orum is proud of the fact that the current
administration has begun to adopt or consider many of the group's
proposals.

In September 1993, the Worldwatch Institute published Global
Network: Computers in a Sustainable Society. The author, John
Young, sees this latest report as a continuation of his efforts to
think about "how to reduce the nasty impacts of industrial
society."

He uses RTK NET to keep in touch with the pulse of the grassroots
movement.  He thinks the network is a good example of how to
"access and manipulate information with an online community that
cares about the information." The conference connects activists
from scattered places who have common interests, reversing the
traditional model of national experts centered in Washington, D.C.,
sending out information to the localities.  On RTK NET experts can
be in New Jersey, Louisiana and Missouri.  "The experts are where
the information is," he says. "And when the information is in
cyber-space, the experts can be anywhere." Young also uses RTK NET
as an information resources to keep up with toxics and the related
legislation. One of his pet peeves about the TRI is that the mining
industry is exempt.

To find out more about Worldwatch or Global Network, contact
"youngj."

ONLINE is published periodically by RTK NET, a joint project of



Search

ONLINE:  The RTK NET Newsletter, Vol.  3, No.  4, Spring 1994

TALES FROM OFF-SITE: NEW REPORT DETAILS TRANSFERS
by Alair MacLean and Rich Puchalsky
In June of 1992, a Rhone-Poulenc factory in Martinez, California,
exploded. Sulfuric acid had spilled and caught fire when it came in
contact with hot machinery. Two workers were critically injured.
One later died.
A year later, Gibraltar Chemical Resources in Winona, Texas, where
waste chemicals are injected deep underground, was ordered to clean
up contaminated groundwater on its site. By the fall, Gibraltar's
environmental problems had grown so large that the state ordered
the company to stop doing business temporarily.
What do these two facilities have in common? Each is among the top
facilities receiving transfers of toxic chemicals according to
information contained in the Toxics Release Inventory (TRI).
Earth Day Events
In April of 1994, as it had for the last five years, the
Environmental Protection Agency released its annual report on the
fate of toxic chemicals used in manufacturing, the TRI. The
approximately 300 chemicals listed on the TRI are considered among
the most dangerous to human health and the environment. For
example, many can cause cancer. This year, as in the past, the
media, the public and regulators focused on the pounds of toxic
chemicals emitted from manufacturing facilities around the country.
Press releases compared this year's reported emissions to last.
Discussion centered on whether facilities or geographic regions had
reduced chemical emissions or not.
But the Toxics Release Inventory tells another, little-noticed
story as well. Contained within manufacturers' yearly reports are
records of more than 80,000 transfers of chemicals to what are
called off-site facilities: recyclers, landfills, and incinerators.
In all, the approximately 23,000 manufacturers sent their toxic
chemicals to more than 5,000 off-site facilities. And, if history
is any guide, these facilities may pose health and environmental
dangers in the future. As of 1991, at least 112 sites on the
federal Superfund list had previously been engaged in recycling
hazardous waste.
Manufacturers reported releasing 3.4 billion pounds of toxic
chemicals to the air, land, and water in 1991. But they sent just
as many pounds of chemicals to be disposed at other facilities. In
1991, manufacturers reported more than 3.4 billion pounds of
transfers to off-site destinations.
Some past analyses have looked at the aggregate number of pounds of
toxic chemicals sent off-site at the state-level. Yet, so far, no
one has compiled a national record of the actual sites that receive
these toxic chemical shipments. The difficulty of collating and
correcting the information has presented a formidable obstacle. And
there is a general perception that transferring chemicals "solves"
the pollution problems associated with releases.
But these transfers may just move short-term accidents and
long-term contamination from one site to another. And the towns
that host off-site destinations end up serving as a dumping ground
for the problems of industrial production.
OMB Watch and Unison Institute undertook the task of analyzing
off-site transfers.  Our report, Where the Wastes Are,  presents
the first examination of the top facilities around the country that
receive shipments of TRI chemicals in waste. (For a previous
examination of the destinations by state see Nancy Lilienthal,
Trading Toxics Across State Lines, INFORM, New York, 1990.) Using

the 1991 TRI data, we have prepared a list of the off-site destinations that receive the greatest poundage of transfers of TRI chemicals from manufacturers. The facilities receiving TRI chemicals are named and ranked.

The top 40 facilities account for 1.7 billion pounds, 48 percent of all chemicals transferred. (Less than 1 percent of the facilities receiving off-site transfers account for only slightly less than one half of all TRI transfers.) The first, third and eighth largest recipients of TRI chemicals are Rhone-Poulenc facilities in Hammond, Indiana, Carson, California, and Baton Rouge, Louisiana. The second and seventh largest recipients of TRI chemicals are General Chemical facilities. A Timken facility in Canton, Ohio, is the fourth largest recipient of TRI chemicals, and a Coulton Chemical facility in Oregon, Ohio, is the fifth largest recipient. A Horsehead Resource Development facility in Palmerton, Pennsylvania, is the sixth largest recipient. Gibraltar Chemical in Winona, Texas, and Petro-Chem Processing in Detroit, Michigan, occupy the number nine and number ten spots. These top ten facilities receive more than one quarter of all the TRI chemicals sent off-site.

The report also identifies the largest recipients of TRI chemicals within specific categories, such as landfills and incinerators. The landfill receiving the most TRI chemicals was operated by Pennfill in Taylor, Michigan. The largest incinerator was operated by Rollins in Baton Rouge, Louisiana. The company receiving the most TRI chemicals for energy recovery was Arco Chemical in Channelview, Texas. The facility receiving the most pounds of TRI chemicals to be injected underground was Gibraltar in Winona, Texas. Rhone Poulenc's facility in Hammond, Indiana, was number one on the list of facilities receiving TRI chemicals for acid regeneration.

The report looks in detail at six companies that dominate selected disposal or recycling methods: incineration, landfilling, underground injection, energy recovery and acid regeneration. These destinations for off-site transfers of TRI chemicals share a history of short-term accidents and long-term contamination. Recipients of TRI transfers have allegedly contaminated water supplies:

In New Castle, Kentucky, a 1992 enforcement action by the EPA of a Safety-Kleen energy recovery facility, the fourth largest facility in terms of TRI shipments, alleged that the company had contaminated the Bartlett Fork Creek with hazardous waste.

In Carlyss, Louisiana, based on inspections that began in 1988, the state has charged that the Chemical Waste Management landfill, number six in terms of TRI shipments, allowed hazardous wastes to contaminate the nearby ground and water.

In Winona, Texas, in 1993, the state ordered the Gibraltar Company, operator of the largest underground injection facility, to clean up

Recipient                          ts of TRI transfers have had potentially dangerous

In Carlyss, Louisiana, in 1988 and 1989, the Chemical Waste Management landfill experienced a series of eight fires that the company failed to report.

In Martinez, California, in 1992, the Rhone-Poulenc acid regeneration facility, number 9 in terms of the weight of TRI chemicals received, suffered a serious accident involving sulfuric acid. Two workers were critically injured. One later died.

number two incinerator in terms of TRI shipments, evidently
received radioactive waste shipments during the eighties.
In Emelle, Alabama, in 1987, the Chemical Waste Management
landfill, number ten in terms of TRI transfers, apparently
illegally stored and transferred Agent Orange.
Facilities receiving TRI chemicals have been ordered closed by
local and federal regulators:

pollution problems. The incinerator is one of the few businesses
ever denied a tax incentive by the state because of pollution
problems.
In Manati, Puerto Rico, in 1992, the Safety Kleen facility, the
sixth largest incinerator in terms of TRI chemicals, had stored
more than 800,000 pounds of excess toxic waste on-site. In
addition, the facility was storing more than a million more pounds
of hazardous waste in un-permitted tanks on the north and south
coasts of Puerto Rico. The facility had to close temporarily and
the Puerto Rican Environmental Quality Board recently fine
Safety-Kleen more than $1.4 million dollars.
In Winona, Texas, in 1993, the Environmental Protection Agency
officially revoked the Gibraltar Company's right to inject
hazardous waste into one of its two underground injection wells
because of an 800 foot gap surrounding the well.
And, in the same year, the state ordered Gibraltar to temporarily
stop receiving hazardous wastes.
At least one of the companies has had prior involvement with a
Superfund site:
In Bridgeport, NJ, the Rollins incinerator, number three in terms
of its receipt of TRI chemicals, has been prosecuted by the federal
government as a Potentially Responsible Party in a couple of
Superfund cases. In a 1988 lawsuit, the company was found to be a
Potentially Responsible Party in the contamination of at least one
Superfund site: the Kin-Buc Landfill in Edison, NJ.
Many of the actions described above represent a failure of
compliance on the part of facilities that receive TRI chemicals. To
prevent the top recipients of TRI transfers from becoming the
Superfund sites of the future, greater attention should be focused
on these sites.
Shippers of TRI chemicals should try to reduce their use of toxic
chemicals in the first place. Toxics use reduction would limit the
number of pounds sent to off-site facilities. Additionally,
reduction of the use of toxic chemicals would lead to a decrease in
emissions of toxic chemicals as well.
Recipients of TRI chemicals should have to report their own
releases and transfers of the chemicals, in order to increase
accountability. Current law only covers certain large manufacturing
facilities. In 1991, these manufacturers reported that they sent

draft of the regulations, manufacturers must allow the public to
see their assessments of the worst-case accidents. Hazardous waste
landfills and incinerators pose dangers as well. They should also
be required to enlist the public in planning for accidents.
Shippers of TRI chemicals should monitor the regulatory and
environmental histories of the companies to whom they ship waste.
The Superfund ensures that companies who ship waste that ends up in
an uncontrolled waste site must bear some share of the burden of
clean-up. With this expanded definition of liability, it is in TRI
shippers interest to monitor the fate of chemicals shipped
off-site.
EPA should ensure that the facilities receiving TRI wastes can
legally handle those wastes. While the largest recipients of TRI
transfers are likely to have permits to receive such waste. A
number of facilities that may not actually have permits to receive
TRI chemicals.
EPA should include examinations of off-site recipients in future
analyses of the Toxics Release Inventory. Through its annual report
on TRI chemicals, EPA each year spotlights manufacturers' releases
of toxic chemicals. But the agency has not consistently examined
the recipients of transfers. In the future, EPA should include
lists of the names of off-site destinations in its analyses of TRI
data.
Alair MacLean works for OMB Watch and Rich Puchalsky works for the
Unison Institute. This article is an excerpt from their recent
report "Where the Wastes Are: Highlights  from the Records of the
More Than 5,000 Facilities that Receive Transfers of TRI
Chemicals." To receive a copy of the full report, contact OMB
Watch.


YOU SAY YOU WANT A REVOLUTION
In the early eighties, it was widely rumored that computers would
supplant books, newspapers, paper files and other symbols of our
retrograde information culture by the end of the decade. The
continued clutter in most offices indicates otherwise. And if the
number of books about how to get onto the Internet is any evidence,
computerization alone may keep the paper industry in business.
More and more RTK NET users have access to the Internet. And soon,
RTK NET itself will provide a gateway to the information highway.
Here's an overview of a small selection of the plethora of new
guides to this new technology. Two of the four manuals label their
intended audiences as "dumb" right in the title, while the other
two take a more neutral stance. But the information contained in
any of the four will provide new users with many of the tools
necessary for participating in the information revolution.
DOES ANYBODY KNOW WHAT TIME IT IS?
Because the revolution takes place in speeds measured in the
thousandths of a second, timeliness is key. Ed Krol's Whole
Internet User's Guide and Catalog was first published in 1992 and
has been printed with minor corrections since.  This otherwise
excellent introduction to the online world therefore does not refer
to certain important functions, such as a searching facility called
Veronica. At the other end of the spectrum, the Big Dummy's Guide
to the Internet was last revised in February 1994. This guide, for
now, is only available through the Internet from the Electronic
Frontier Foundation. This presents something of a catch-22: you
must have at least rudimentary networking skills in order to get
this beginner's manual. According to the introduction, the Big
Dummy will be published in June of 1994. If you can hold out that
long, the printed version will probably be the most up-to-date
overview of the Internet.
It has become something of a cliche that the Internet is anarchic
and confusing. So any book that provides a semblance of a structure
gives the novice an advantage.  Krol's elucidation follows the

Case 2:99-cv-00070-AAA   Document 34   Filed 04/07/99   Page 66 of 99

Internet's logical development, beginning with a detailed history
of the network and moving through the various functions, from the
simplest to the most complex, from telnet to the World-Wide Web.
After reading this guide, you feel you understand how the Internet
was constructed. The Big Dummy book follows a more practical
"how-to" structure. It starts not with the Internet's beginnings,
but with a beginner's beginning: how to get access. And the
description really takes off with a discussion of electronic mail
(e-mail) the function that most commonly introduces users to
networking.

INSIDE OUT

The authors display radically different attitudes toward their
shared subject. The Whole Internet, with its elaborate treatment of
the birth of the network and detailed descriptions of protocols, is
a little dry and computer specific. As you might expect, The
Internet for Dummies affects a sarcastic tone. One of their
graphics indicates which parts of the text are "Nerdy technical
discussions you can skip if you want." The frequent jokes and
tongue in cheek descriptions imply that we "Dummies" are actually
smarter than the nerds who set up the computers. This approach does
yield useful information not as readily available in less critical
books. For example, Internet Relay Chat "seems to be mostly
frequented by bored college students." Big Dummy's inhabits the
middle ground, combining a free-flowing prose style with sometimes
technical information. The Whole Internet is written from the
inside looking out, while the dumb books convey the vantage of the
outside looking in.

NOW WHAT?

But once you, the novice, are actually inside--on the net--then
what? The Whole Internet contains the best catalog of the "how-to"
books. Big Dummy's includes references to different services as
they are mentioned in the text. The selection of services is
strangely idiosyncratic, including a disproportionate number of
sites in Cleveland. To get a real sense of the vastness of the
online world, however, you'll want a book like The Internet
Directory. The short, mostly conceptual descriptions of the
different services won't get you started, but once you have an idea
of how to navigate the net, this Directory includes literally
thousands of addresses that tell you where to go.

You will probably want to rely on more than one reference. Read a
number of these books in succession and you will notice small, but
significant, omissions. Big Dummy would have you download a
"README" or help file when such a usually short and necessary file
would best be read online, as described by Krol. But, you say, I
don't want to read four books just to get online. Well, then start
with Big Dummy's for the latest on technique, and, if you feel like
it, add The Internet Directory for a guide to the resources of the
online universe.

TO ORDER:

The Whole Internet User's Guide & Catalog, contact O'Reilly &
Associates at (800) 998-9938 or "nuts@ora.com."
The Internet for Dummies, contact IDG Books Worldwide at (415)
312-0650.
The Internet Directory, in major bookstores.
The Big Dummy's Guide to the Internet (forthcoming from MIT Press),
FTP to eff.org.

FOLLOW-UP: CORPORATE BUYOUTS OF COMMUNITIES

In the Winter 1993 issue of ONLINE, we took a look at a new trend:
corporate buyouts of communities. Here are some recent developments
in relations between corporations and communities.
When the vegetables in her garden started dying, Janice Dickerson
decided to complain to Georgia Gulf, the nearby chemical company.
"If something like that is happening with vegetables," says

Dickerson, "you have to wonder what's happening to the people." At
the time, Dickerson was a resident of Reveilletown, a small
community near Baton Rouge. In 1989, a decade after her first
complaints and a law-suit later, Dickerson and fifteen other
families received a settlement that provided them with money to
move to new homes. For the dozen or so families who did not join
the suit, Georgia Gulf built a subdivision called Reveilletown Park
two miles from the factory fenceline. Today, only two small houses
remain to mark where the 150 black residents of Reveilletown once
lived.
The Georgia Gulf purchase of Reveilletown was one in a series of
corporate buyouts of black communities in the Baton Rouge area.
Just months after the Reveilletown settlement, Dow Chemical offered
to relocate the residents of Morrisonville. In 1991, Placid Oil
settled a law suit with the residents of Sunrise by agreeing to pay
for a move. And Exxon executives continue to purchase property near
their plant in Baton Rouge.

"It's just generally not compatible to have chemical plants and
residences next to each other," says Beverly Gholson, a lawyer with
Georgia Gulf who helped negotiate with Reveilletown residents. "If
we were going to locate a new plant, we wouldn't do it near
residences. Very few chemical companies would."
Yet, some chemical companies and other potentially dangerous
facilities continue to choose residential areas. In 1989, the year
of the Reveilletown buyout, the Formosa company announced plans to
build a large-scale rayon factory in one of the few areas along the
Mississippi River between Baton Rouge and New Orleans that contain
no petrochemical plants. To observers, the company's purchases of
homes in Wallace, a community that had been founded by former
slaves after the Civil War, followed a distressingly familiar
pattern. In October 1992, the company announced that it would not
move forward with the plant. "But that area is slated for
development one way or another," says Audrey Evans of the Tulane
Environmental Law Clinic, which assisted Wallace residents in
fighting Formosa.
The loss of historically black communities to the vagaries of the
chemical industry has focused attention on the fight for
environmental justice. "Our situation helped bring attention to the
plight of poor, rural communities," says former Reveilletown
resident Dickerson. "Folk told me they didn't even know we were
down there." Dickerson recently received funding from the state
Department of Environmental Quality to combat environmental
injustice, which, she says, has led to the rash of buyouts in the
first place. And she hopes to stop the local government from
placing a sewage treatment plant in a predominately black
neighborhood just three miles from where she moved.
In 1990, spurred in part by stories of corporate buyouts, the
Louisiana Advisory Committee to the U.S. Commission on Civil Rights
began to examine whether environmental racism might be an issue in
the state. Last fall, the commission issued its report. The report
echoes Georgia Gulf's Gholson's observations that residences and
chemical plants are incompatible. The authors recommend that
Louisiana adopt zoning regulations requiring companies to ensure
buffer zones around factories.
But this recommendation has been made before to no avail. In 1984,
a state Supreme Court decision required Louisiana to develop
land-use planning guidelines.  Paul Templet, head of the state
Department of Environmental Quality from 1988 to 1992, expresses
frustration with the pace of change. He says that industry
representatives have long opposed any government control. "If the
industry thought long-term, they wouldn't be opposed to land-use
planning," says Templet. "But the kind of guy you get running a
plant is only concerned with next quarter's bottom line and that's
not long-term."

WHAT'S AHEAD FOR THE RIGHT-TO-KNOW
by Alair MacLean
OMB Watch

Think of the Toxics Release Inventory as a tax code for
manufacturers. Then you'll get a sense of how industry executives
feel about the Form R: the IRS form 1040 of pollution. If anything,
industry antipathy for this yearly ritual may be even greater than
yours for paying taxes. But, while you may grumble about how much
you owe, corporate executives have trade associations who can lobby
the regulators on their behalf.

The Chemical Manufacturers Association wants to redefine
underground injection by moving certain fields from one part of the
form to another. Small businesses, like the National Soft Drink
Association, would like to avoid having to fill out the form
altogether.  These, and other industry groups continue to plead
their cause to the Environmental Protection Agency, which designs
the form, and the Office of Management and Budget, which approves
it.

In the last six months, OMB's Office of Information and Regulatory
Affairs has logged approximately thirty meetings with
non-governmental representatives, according to Dan Cook of OMB
Watch. Three of these meetings, one tenth the total, concerned
potential changes in the requirements for reporting to the Toxics
Release Inventory. In early February, OIRA head Sally Katzen met
with industry advocates of the proposal to redesign the form. And
in mid-April, OIRA hosted a meeting to discuss exempting small
sources from reporting. (In December, OMB Watch and other
environmental groups met with OIRA staff to advocate adoption of an
EPA proposal to increase the number of chemicals included in the
Inventory.)

The meeting regarding small sources was just the latest in a series
of actions initiated by the Small Business Administration almost
three years ago.  In August 1991, the SBA petitioned EPA to
establish thresholds that would exempt facilities that release
small quantities of TRI chemicals from reporting. "It did not make
sense for these companies to be spending hundreds of millions of
dollars a year to be cleaning up problems they didn't have," says
Kevin Bromberg, who drafted the petition and is now counsel for the
Small Business Coalition for a Responsible TRI policy. In February
1992, the American Feed Industry Association submitted a similar
petition requesting that animal feed producers not have to report
to the TRI. The EPA now predicts that the small source exemption
rule will be published for comment, following OMB review, sometime
in June 1994.

Under the current version of the TRI, manufacturers do not have to
report releases of chemicals as long as they make or use less than
certain specified amounts.   Under the SBA proposal, if
manufacturers released less than a certain amount, they would not
have to report releases. For example, if a facility were releasing
less than 5,000 pounds of ammonia in a year, the facility would not
have to report any releases of the chemical.  EPA analysis prepared
in January 1994 showed that such an exemption would reduce the
total amount of releases and transfers reported to the agency by .8
percent. But more than 20 percent of the total waste reported to
EPA would be excluded by this definition.

Environmentalists have insisted from the start that regulators must
ensure that only legitimately small sources be exempt. Paul Orum of
the Working Group on Community Right-to-Know also advocates that
EPA monitor exempt facilities annually. "We would feel that we had
won a victory if there had to be certification and only releases
below ten pounds were exempted," says Orum.

For the facilities that still have to report there may be changes
up ahead. Sometime in the fall of 1994, EPA staff hope to circulate
a revised and streamlined Form R. If the CMA has its way, that new

form will ask manufacturers to report toxic chemicals disposed in
certain underground injection wells in a section of the form titled
"Source Reduction and Waste Management Activities," rather than the
section that details releases to the environment. "Where industry
is coming from is they want the Class I wells, the supposedly safe
ones, to be considered not a release," says EPA's Anning Smith.
Class I wells, in contrast to other injection wells, are required
not to contaminate drinking water.
Both battles--who reports and how they report--concern how the TRI
is to be defined and what it will cost. Industry representatives,
like Kevin Bromberg, claim that reporting to the TRI unfairly
stigmatizes facilities. And EPA has estimated that a small source
exemption could save industry as much as $66 million. As you
probably expected, filing the 1040 of pollution has a price tag.
Wonder how much we'd all save if we didn't file taxes.


ACT LOCALLY, ACT GLOBALLY
BACKGROUND INVESTIGATIONS
In 1983, Marco Kaltofen founded the Boston Chemical Data
Corporation in Wellesley, Massachusetts, to provide environmental
research services to community groups. Kaltofen worked for the
National Toxics Campaign between 1988 and 1993. Before that he
worked for Greenpeace.
Boston Chemical Data has done everything from performing laboratory
tests to helping prepare testimony. The staff have even drilled
monitoring wells in the communities. They have worked in Texas,
Ohio, New Jersey, New York, Pennsylvania, Eastern Europe, and
Russia.
Kaltofen uses RTK NET "in most cases." He spends two to three hours
a week on RTK NET. Most commonly, he compares the TRI emissions of
similar companies. If a community group, for example, is planning
a suit against a large corporation, he will use RTK NET to get
information about the environmental record of all of the company's
facilities. He also uses Permit Compliance System Data, FINDS, and
the Council on Environmental Quality reports available in summary
form on the network. With these sources of information he is able

For more information about the Boston Chemical Data Corporation,
contact "kaltolfm."
ALL FOR ONE AND ONE FOR ALL
Since 1989, Paul Orum has been the coordinator of the Working Group
on Community Right-to-Know, a network of environmental and public
interest groups.  US-PIRG has been the host organization for the
Working Group for the last five years.  Orum is the Working Group's
only paid staff member.  Today 2 dozen national groups and 1500
state and local groups are affiliated with the working group.
Recently the coalition has focused on expanding the Right-to-Know
to include federal facilities, more chemicals, and chemical use
information.  Orum is proud of the fact that the current
administration has begun to adopt or consider many of the group's
proposals.
He uploads bi-monthly newsletters to the Newsletters section of RTK
NET. And uses the network to communicate other notices of current
activities. When EPA called for comments on Clean Air Accident
Prevention regulations, Orum and others communicated through
e-mail, exchanging messages, documents and sample comments among a
core group of people. "That was really very beneficial," he says.
He thinks that RTK NET is most effective in cases like this, when

In September 1993, the Worldwatch Institute published Global
Network: Computers in a Sustainable Society. The author, John
Young, sees this latest report as a continuation of his efforts to
think about "how to reduce the nasty impacts of industrial



"access and manipulate information with an online community that
cares about the information." The conference connects activists
from scattered places who have common interests, reversing the
traditional model of national experts centered in Washington, D.C.

be in New Jersey, Louisiana and Missouri.  "The experts are where
the information is," he says. "And when the information is in
cyber-space, the experts can be anywhere." Young also uses RTK NET
as an information resources to keep up with toxics and the related
legislation. One of his pet peeves about the TRI is that the mining
industry is exempt.
To find out more about Worldwatch or Global Network, contact
"youngj."


ONLINE is published periodically by RTK NET, a joint project of
Unison Institute and OMB Watch. The Unison Institute is a center
for computer systems and software technology in the public
interest. OMB Watch is a nonprofit public interest group that
advocates for the public's right-to-know and greater government
accountability.
Editor:

Exhibit D

45TH STORY of Level 1 printed in FULL format.

Copyright 1989 U.S. News & World Report
U.S. News & World Report

June 26, 1989

SECTION: U.S. NEWS; Vol. 106, No. 25; Pg. 28

LENGTH: 848 words

HEADLINE: The toxic avenger strikes at corporate polluters

BYLINE: By Michael Satchell

HIGHLIGHT:
A civilian chemist uses hit-and-run guerrilla tactics as he prowls fouled
backwaters and infiltrates companies

BODY:
   It is midnight as the tiny Zodiac inflatable craft bounces north through the
chop of America's most famously filthy harbor. With the downtown Boston skyline
glowing about 2 miles behind and the eerie lights of the Monsanto Company plant
dead ahead, Marco Kaltofen steers into a creek, cuts the 40-horsepower Nissan
outboard and begins paddling toward a set of discharge pipes. The lone toxic
avenger and the chemical conglomerate are old adversaries, and tonight Kaltofen
is returning to sample its wastes.

   Kaltofen, 29, who operates a chemical-analysis laboratory for the
Boston-based National Toxics Campaign, began his particular brand of
environmental activism some five years ago. He slips into plants disguised as a
utility worker or zips around the waterfront, staging hit-and-run forays while



bottles, plastic bags and a notebook. Boston's low-tech toxic detective samples
and analyzes soil, air and liquid discharges on or near the property of
suspected polluters. His newest weapon is a radio-controlled model airplane
equipped to fly over smokestacks and gather air samples.

   With results in hand, he often calls a press conference to publicize his
findings. If the pollution is severe, he takes his evidence to local
authorities, and he is credited with spurring several successful prosecutions.
As an environmental guerrilla, his activism has been more creative and effective
than that of other so-called monkey wrenchers. Some radicals hammer spikes into
old-growth trees to thwart the chain saw, pour sand into bulldozer tanks, switch

120-year-old plant but stresses that Monsanto is working hard on remedial action. "We are moving expeditiously, but Marco would like to see it done sooner," Ferrante says. "So would we, but we have to follow the law."

The Dutch-born Kaltofen began his environmental activism in 1982, plunging into the kind of direct-action showboating that garners easy headlines and television footage but has little permanent value. He chained himself to truckloads of sludge, delivered barrels of waste to corporate headquarters and annual stockholders' meetings and plugged discharge pipes at polluting companies. He has been arrested more than a dozen times and convicted once of trespassing. "At some point, I realized that delivering hazardous materials to a company office was in itself an act of violence," he says. "So I switched tactics."

Recently, federal criminal-enforcement efforts have bogged down in bureaucratic inertia and infighting, and Washington is encouraging local authorities to step up prosecution of major polluters. Massachusetts in May launched a 33-member state strike force of scientists, lawyers and undercover agents to crack down, though there are still some like Kaltofen who believe that civilians are more effective than government at the investigative side of enforcement.

His most successful thrust to date has been against American Cyanamid in Linden, N.J., where Kaltofen spent two months surreptitiously gathering pollution samples at the chemical plant, interviewing employes and sifting through public records. Based on his files, the state attorney general's office launched an investigation, and in 1987 the company pleaded guilty to 37 criminal counts of polluting the Rahway River. American Cyanamid was fined $ 900,000, at the time the largest penalty ever assessed in a New Jersey environmental case, and agreed to make major antipollution improvements. "Without the information from Marco, we would not have targeted this company," says Robert Candido, the former chief of environmental prosecutions, who handled the case. "I think he does an outstanding job in terms of public service."

Like many activists, Kaltofen is driven by a sense of deep frustration. When it comes to cleanup, things never happen fast enough. Equally infuriating is the fact that much toxic dumping violates no law, further evidence to him that the nation's environmental priorities are askew. His Boston Harbor bailiwick, where President George Bush turned environmental issues on Massachusetts Governor Michael Dukakis and helped sink his campaign last fall, and where flounder are still pulled from the water bearing golf-ball-size tumors, is a perfect example. "There's a bill in the State Legislature to close the harbor to fishing," he says. "Why not close the harbor to toxic dumping?"

GRAPHIC: Picture, Marco solo sets off. Kaltofen heads toward a plant to search for toxic samples, ROSWELL ANGIER

LANGUAGE: ENGLISH

Exhibit E

p1 - 180

CAUSE NO. 15,527

| | |
|---|---|
| GARY DAVID HARDING AND TERESA ) | IN THE DISTRICT COURT |
| D. HARDING, INDIVIDUALLY, AND ) | |
| AS NEXT FRIENDS FOR LATASHA ) | |
| ROSSĨ AND BRANDON METHVIN, ) | |
| MINORS, ET AL. ) | |
| ) | |
| VS. ) | OF DUVAL COUNTY, TEXAS |
| ) | |
| BROWNING-FERRIS INDUSTRIES, ) | |
| INC., FRANKLIN F. KELLY, ) | |
| INDIVIDUALLY, AND AS OWNER OF ) | |
| FRANKLIN F. KELLY WASTE ) | |
| DISPOSAL COMPANY, AND FRANKLIN) | |
| F. KELLY WASTE DISPOSAL ) | |
| COMPANY AND WASTE DISPOSAL ) | |
| CENTER, INC., ET AL. ) | 229TH JUDICIAL DISTRICT |

DEPOSITION OF

MARCO KALTOFEN

VOLUME I

DEPOSITION OF MARCO KALTOFEN taken on the 19th day of

April, 1995, in the offices of Woodard, Hall & Primm, 7000

Texas Commerce Tower, Houston, Harris County, Texas, between

the hours of 8:05 a.m. and 12:10 p.m., pursuant to Notice

and stipulation of counsel.

1630 Two Houston Center
909 Fannin Street
Houston, Texas 77010
Tel 713 650 1800
Fax 713 650 6245
1 800 544 3218



Southwest
Reporting
and Video
Service
Incorporated

**1**

CAUSE NO. 15,527

```
 1
 2   GARY DAVID HARDING AND TERESA )  IN THE DISTRICT COURT
     D. HARDING, INDIVIDUALLY, AND )
 3   AS NEXT FRIENDS FOR LATASHA   )
     ROSSI AND BRANDON METHVIN,    )
 4   MINORS, ET AL.                )
                                   )
 5   VS.                           )  OF DUVAL COUNTY, TEXAS
                                   )
 6   BROWNING-FERRIS INDUSTRIES,   )
     INC., FRANKLIN F. KELLY,      )
 7   INDIVIDUALLY, AND AS OWNER OF )
     FRANKLIN F. KELLY WASTE       )
 8   DISPOSAL COMPANY, AND FRANKLIN)
     F. KELLY WASTE DISPOSAL       )
 9   COMPANY AND WASTE DISPOSAL    )
     CENTER, INC., ET AL.          )  229TH JUDICIAL DISTRICT
10
11
12                  DEPOSITION OF
13                  MARCO KALTOFEN
14                     VOLUME I
15
16
17        DEPOSITION OF MARCO KALTOFEN taken on the 19th day of
18   April, 1995, in the offices of Woodard, Hall & Primm, 7000
19   Texas Commerce Tower, Houston, Harris County, Texas, between
20   the hours of 8:05 a.m. and 12:10 p.m., pursuant to Notice
21   and stipulation of counsel.
22
23
24
25
```

**2**

I N D E X
DEPOSITION OF MARCO KALTOFEN

PAGE

Appearances....................................... 3
Stipulations...................................... 4
Examination
    By Mr. Shoebotham........................... 4
Correction Page................................... 181
Signature Page.................................... 182
Reporter's Certificate............................ 183

- - -

E X H I B I T  I N D E X
NO.    DESCRIPTION              PAGE MARKED
 1  Curriculum Vitae of Witness ..........   4
 2  Deposition Notice...................   4
 3  Amended Deposition Notice............   4
 4  Second Amended Deposition Notice......   4
 5  "Laboratory Test Results," 11-1-94....   15
 6  "Laboratory Data Reports"............   15
 7  Chains of Custody....................   16
 8  Work Product of Witness..............   17
 9  Computer Diskette....................   17

**3**

A P P E A R A N C E S

COUNSEL FOR THE PLAINTIFFS:

    HILLIARD, GRILLO & MUNOZ
    719 S. Shoreline, Suite 600
    Corpus Christi, Texas 78401
        By: MR. KEVIN GRILLO

COUNSEL FOR THE DEFENDANT, BROWNING-FERRIS
INDUSTRIES, INC.:

    WOODARD, HALL & PRIMM
    7000 Texas Commerce Tower
    Houston, Texas 77002
        By: MR. JONATHAN B. SHOEBOTHAM
            MR. DOUGLAS B. DOUGHERTY

COUNSEL FOR THE DEFENDANTS, FRANKLIN F. KELLY,
INDIVIDUALLY, AND AS OWNER OF FRANKLIN F. KELLY
WASTE DISPOSAL COMPANY, AND FRANKLIN F. KELLY WASTE
DISPOSAL COMPANY AND WASTE DISPOSAL CENTER, INC.:

    BRIN & BRIN
    1202 Third Street
    Corpus Christi, Texas 78404
        By: MR. DAVID L. RUMLEY

COUNSEL FOR THE DEFENDANT, ENSCO:

    MEREDITH, DONNELL & ABERNETHY
    1500 One Shoreline Plaza, North Tower
    Corpus Christi, Texas 78401
        By: MR. ALEX HAMMACK

COUNSEL FOR THE DEFENDANT, ASARCO:

    COVINGTON & BURLING
    1201 Pennsylvania Avenue, N.W.
    Washington, D.C. 20044-7566
        By: MS. JOANNE B. GROSSMAN

ALSO PRESENT: Ms. Gail Brownfeld
              Mr. Tony Canales
              Ms. Barbara Black

**4**

```
 1              (Kaltofen Exhibit Nos. 1 through 4
 2        were marked for identification.)
 3              MR. SHOEBOTHAM: Texas Rules of Civil
 4        Procedure?
 5              MR. GRILLO: Send the original to us.
 6        Send it to us and we'll get it to him.
 7              MARCO KALTOFEN,
 8   called as a witness, was duly cautioned and sworn by the
 9   Court Reporter to testify the truth and nothing but the
10   truth, and thereupon in answer to questions propounded by
11   counsel, testified as follows:
12              EXAMINATION
13   QUESTIONS BY MR. SHOEBOTHAM:
14   Q.   Would you please state your full name.
15   A.   My name is Marco Paul Johann Kaltofen.
16   Q.   And what is your address?
17   A.   My address is Post Office Box 812392, Wellesley,
18        Massachusetts, 02181.
19   Q.   Is that your professional address?
20   A.   Yes, it is.
21   Q.   Mr. Kaltofen, my name is Jon Shoebotham. I'm a
22        lawyer. I practice law in Houston with the law
```

21

| | | |
|---|---|---|
| 1 | | probably something on the order of a couple of |
| 2 | | dozen other invoices? |
| 3 | A. | Correct. |
| 4 | Q. | Can we get a copy of those? |
| 5 | | THE WITNESS: The only thing I'd like |
| 6 | | to do is probably discuss it with you, |
| 7 | | because some of these invoices are bundled. |
| 8 | | There will be invoices for several cases. I |
| 9 | | don't know if that's going to be a problem. |
| 10 | | MR. GRILLO: That would be the only |
| 11 | | thing. We'll give you all the invoices |
| 12 | | related to this case. If there's some that |
| 13 | | have multiple charges, to the extent I feel |
| 14 | | like there's a consulting expert privilege or |
| 15 | | some other objection, we may white it out. |
| 16 | | If it's whited out, the only reason it's |
| 17 | | whited out is that it doesn't have anything |
| 18 | | to do with this case. |
| 19 | | MR. SHOEBOTHAM: I just want his |
| 20 | | invoices regarding the Harding case. |
| 21 | | MR. GRILLO: We agree. |
| 22 | A. | I do have all the invoices here, and what I can do |
| 23 | | is provide a disk to Mr. Grillo and they can delete |
| 24 | | any references that are unrelated in those. |
| 25 | | MR. GRILLO: We'll give you all the |

22

| | | |
|---|---|---|
| 1 | | invoices related to this. If there's |
| 2 | | something beyond that, we'll talk about it. |
| 3 | Q. | (By Mr. Shoebotham) Do you know approximately how |
| 4 | | much you have billed in connection with this case, |
| 5 | | the Harding case? |
| 6 | A. | Somewhere in the five figures. |
| 7 | Q. | That's a pretty big range. |
| 8 | A. | Yes, it is. |
| 9 | Q. | Can you pin it down any better than that? |
| 10 | A. | I'm an engineer, not an accountant, I'm afraid. |
| 11 | | That's not a number I can give you offhand. |
| 12 | Q. | Can you access that in your computer that you |
| 13 | | brought with you? |
| 14 | A. | Well, yeah. It would take some -- I'd say come |
| 15 | | back after lunch. |
| 16 | Q. | You might be able -- |
| 17 | A. | Well, I mean, if I start now and do nothing else. |
| 18 | Q. | Oh, it would be a lengthy process. |
| 19 | A. | Yeah, because I'd have to go through all the |
| 20 | | invoices I have here. I literally have every |
| 21 | | invoice I've ever written for any client in here. |
| 22 | | I'd have to go through them all and take out the |
| 23 | | billing reference for this. |
| 24 | Q. | When Mr. Grillo provides the invoices concerning |
| 25 | | the Harding case, if we just total those up -- |

23

| | | |
|---|---|---|
| 1 | A. | Oh, absolutely. |
| 2 | Q. | -- that would reflect the total charges on the |
| 3 | | case? |
| 4 | A. | That would be exactly what you're looking for. |
| 5 | Q. | Do you have any time that you have incurred on the |
| 6 | | case that you haven't generated invoices for? |
| 7 | A. | There's this morning. |
| 8 | Q. | Other than just your work today? |
| 9 | A. | No. |
| 10 | Q. | Do you have any kind of budget for your work on |
| 11 | | this case? |
| 12 | A. | No. I'm -- I'm working on a monthly basis. |
| 13 | Q. | And when you say that, you mean you just bill on a |
| 14 | | monthly basis? |
| 15 | A. | That's correct. |
| 16 | Q. | There's no -- |
| 17 | A. | I'm given certain duties to perform. I perform |
| 18 | | them. They're billed at the end of the month and |
| 19 | | that's all. |
| 20 | Q. | There's no cap or budget on how much you're to |
| 21 | | charge? |
| 22 | A. | Not that I'm aware of. |
| 23 | Q. | Do your invoices come from -- to Hilliard, Grillo & |
| 24 | | Munoz -- from you personally or from Boston |
| 25 | | Chemical Data Corporation? |

24

| | | |
|---|---|---|
| 1 | A. | The invoices always come from Boston Chemical Data. |
| 2 | | I don't get personally paid for the work. |
| 3 | Q. | Let me ask you about Boston Chemical Data |
| 4 | | Corporation. How large a company is that? |
| 5 | A. | In the -- in which sense? |
| 6 | Q. | In terms of number of employees. |
| 7 | A. | There's one employee. You're looking at him. |
| 8 | Q. | Is that employee sitting here in the deposition |
| 9 | | today? |
| 10 | A. | Yes, he is. |
| 11 | Q. | Are you the only employee of Boston Chemical Data |
| 12 | | Corporation? |
| 13 | A. | Yes, I am. |
| 14 | Q. | Is that a corporation? |
| 15 | A. | Yes, it is. |
| 16 | Q. | Where is it organized? |
| 17 | A. | It's a Massachusetts corporation. |
| 18 | Q. | Are you the sole shareholder? |
| 19 | A. | Yes, I am. |
| 20 | Q. | And what offices do you hold in the corporation? |
| 21 | A. | All of them, except for directors. |
| 22 | Q. | And you're the only employee of the corporation. |
| 23 | A. | Correct. |
| 24 | Q. | Where are the offices of Boston Chemical Data |
| 25 | | Corporation? |

101

| | | |
|---|---|---|
| 1 | Q. | Tell me what your activities were in connection |
| 2 | | with participating in environmental demonstrations. |
| 3 | A. | It was more like organizing them, generally, |
| 4 | | putting together plans for people who were |
| 5 | | participating in the demonstrations. I would |
| 6 | | normally be present. I would do things like speak |
| 7 | | to the media or speak to other people who might be |
| 8 | | involved in the process, like a regulator or an |
| 9 | | owner. I would find housing for people and the |
| 10 | | like, do interviews with local newspapers. |
| 11 | Q. | Would you actually travel to places around the |
| 12 | | world and organize demonstrations in those places? |
| 13 | A. | Well, I organized some demonstrations in the U.S. |
| 14 | | probably for a period of about 24 months, two |
| 15 | | years, and the rest of that time was spent actually |
| 16 | | meeting with -- say, meeting with a few executive |
| 17 | | officers of some chemical companies in Europe or in |
| 18 | | some other location. |
| 19 | Q. | Was that your primary activity during the time that |
| 20 | | you were with Greenpeace, organizing these |
| 21 | | demonstrations? |
| 22 | A. | There were times when it was, yeah. |
| 23 | Q. | What other kinds of -- |
| 24 | A. | Well, actually, I have to take that back. It was a |
| 25 | | fairly large number of different activities. I'd |

102

| | | |
|---|---|---|
| 1 | | say certainly the most visible work anyone would do |
| 2 | | would be working -- being on a television program, |
| 3 | | but, you know, in retrospect, it was a minority of |
| 4 | | the time. |
| 5 | | But it -- a lot of the other work, I imagine |
| 6 | | you could say, was geared towards that. I think I |
| 7 | | may have actually spent a total of maybe ten, |
| 8 | | fifteen business days doing what we would call a |
| 9 | | demonstration, but a lot of days that were, you |
| 10 | | know, meeting people in a community or meeting |
| 11 | | owners related to that. |
| 12 | Q. | Were you ever arrested in any of the |
| 13 | | demonstrations? |
| 14 | A. | I think I was, yes. |
| 15 | Q. | About how many times did that happen? |
| 16 | A. | I think I was arrested and charged with trespassing |
| 17 | | in California, and then there were numerous |
| 18 | | occasions where there were -- you'd call them |
| 19 | | negotiations one way or another with a law |
| 20 | | enforcement officer related to demonstrations. I |
| 21 | | think maybe two or three times may have resulted in |
| 22 | | a charge being filed and there was one where we |
| 23 | | actually pled guilty to trespassing. |
| 24 | Q. | What occasion was that where you actually pled |
| 25 | | guilty to trespassing? |

103

| | | |
|---|---|---|
| 1 | A. | That was in California, and I don't have -- I'd |
| 2 | | have trouble giving you the date, but I do |
| 3 | | recall -- I have the name of the attorney and I |
| 4 | | might be able to get that from her. |
| 5 | Q. | What's her name? |
| 6 | A. | Carol Sobell. |
| 7 | Q. | What town is she in? |
| 8 | A. | She's in Los Angeles, California. |
| 9 | Q. | At what facility were you charged with trespassing? |
| 10 | A. | Santa Monica Civic Center. |
| 11 | Q. | And what were the circumstances that prompted the |
| 12 | | charge that you had trespassed at the Santa Monica |
| 13 | | Civic Center? |
| 14 | A. | We had parked a truck, with some barrels and a |
| 15 | | banner, in front of the Santa Monica Civic Center |
| 16 | | and refused to leave. |
| 17 | Q. | What was in the barrels? |
| 18 | A. | Rainwater, leachate, from one of Occidental |
| 19 | | Chemical's facilities. |
| 20 | Q. | What was going on inside the civic center? |
| 21 | A. | Their annual meeting. |
| 22 | Q. | The Occidental annual meeting? |
| 23 | A. | Yes. |
| 24 | Q. | Other than that one occasion that you've just told |
| 25 | | me about where charges were filed and you pled |

104

| | | |
|---|---|---|
| 1 | | guilty, has there been any other occasion where |
| 2 | | charges were filed and you actually pled guilty to |
| 3 | | some criminal charge? |
| 4 | A. | Criminal? Is it a criminal offense to have your |
| 5 | | driver's license expire? |
| 6 | Q. | I don't -- has that happened to you? |
| 7 | A. | Yeah. |
| 8 | Q. | Okay. |
| 9 | A. | I wasn't driving, though, but I just had an expired |
| 10 | | driver's license. |
| 11 | Q. | Other than an expired driver's license. |
| 12 | A. | No. I don't think so, no. |
| 13 | Q. | What are the other -- |
| 14 | A. | Although the exact -- again, I think Carol Sobell |
| 15 | | is the best person to talk to, because the law goes |
| 16 | | over my head. |
| 17 | Q. | On what other occasions have you been arrested? |
| 18 | A. | There was an occasion in Braintree, Massachusetts |
| 19 | | where -- it was very similar in nature. It was a |
| 20 | | truck with a banner on the side. I was there with |
| 21 | | a -- some of the older women from the neighborhood |
| 22 | | were having a press conference in front of a |
| 23 | | facility. We were asked to leave and we didn't and |
| 24 | | we were -- we were arrested on a charge. I don't |
| 25 | | think it ever went to trial. |

105

1  Q.  What was the facility that you were in front of?
2  A.  It was a Clean Harbors facility in Braintree,
3       Massachusetts.
4  Q.  When was this?
5  A.  Mid-1980's.
6  Q.  When was the incident in Santa Monica, California?
7  A.  Mid-1980's, early to mid.
8  Q.  Were most of those incidents while you were with
9       Greenpeace?
10  A.  I think so, yes.
11  Q.  Have there been any other occasions in which you've
12       been arrested?
13  A.  I'm thinking.
14       There was one, yes. It was in New Jersey and
15       it was when -- we were collecting samples from a
16       waste diffuser outlet. And again the charges
17       escape me, but I could probably point you to the
18       law firm and get you that information.
19  Q.  Where in New Jersey was it?
20  A.  Toms River, New Jersey. Well, actually, it was on
21       the ocean, so it's a different jurisdiction, but I
22       believe it went to trial in Toms River, New Jersey.
23  Q.  You're saying Times River?
24  A.  Toms River.
25  Q.  Toms River.

106

1  A.  Toms River. And I believe those charges were
2       dismissed.
3  Q.  Have there been any other occasions in which you've
4       been arrested?
5  A.  Everett, Massachusetts.
6  Q.  Everett, Massachusetts?
7  A.  Same thing.
8  Q.  Was it a trespass charge?
9  A.  Again, I'd have to check with my attorney at the
10       time, if --
11  Q.  Who was your attorney?
12  A.  -- they're still in practice.
13  Q.  Who was your attorney?
14  A.  I've forgotten. It was early 1980's.
15  Q.  What was the charge?
16  A.  I honestly don't remember. I'd have to check with
17       him. And I know I've probably got his name in my
18       Roladex, so -- but the same issue: a truck, a
19       banner.
20  Q.  You were charged with trespassing or --
21  A.  I -- you know, it seems like the likely charge, but
22       I'd have to find out. There was no conviction in
23       the case. It was dismissed.
24  Q.  The circumstances were that you had parked a truck
25       or a van someplace and --

107

1  A.  We had a banner and held a press conference and so
2       on.
3  Q.  Have there been any other occasions that you've
4       been arrested?
5  A.  Not that I can remember right now. It's been a few
6       years, but something might -- well, no. I think
7       that's about it.
8  Q.  The case in California in which you were actually
9       convicted, what was the sentence?
10  A.  I did community service. I worked with low-income
11       homeowners and residents in the Boston area to help
12       them lower their water and sewer bills.
13  Q.  Has there been another occasion, other than the one
14       in California, where you've been arrested and the
15       charges actually came to a trial or you were
16       actually convicted?
17  A.  I don't think there were, no.
18  Q.  Did you consider yourself to be an environmental
19       activist at that time?
20  A.  Yes.
21  Q.  Do you still consider yourself to be an
22       environmental activist?
23  A.  No.
24  Q.  When did you stop considering yourself to be an
25       environmental activist?

108

1  A.  When I got tired of working 20 hours a day for
2       $12,000 a year.
3  Q.  When did you --
4  A.  That didn't take very long.
5  Q.  When did you cease being an environmental activist?
6  A.  I left Greenpeace in -- well, as an employee, I
7       believe I left the organization in 1986, and I did
8       some consulting work for them after that.
9  Q.  But you would agree -- during the time that you
10       were with Greenpeace, you would agree with the
11       description that you were an environmental activist
12       during that time?
13  A.  Oh, yeah, absolutely.
14  Q.  Even since you've left Greenpeace, do you still
15       engage in any activities that would -- that you
16       would consider to be environmental activism?
17  A.  Yes, I do.
18  Q.  What activities have you engaged in after
19       Greenpeace that you would consider to be
20       environmental activism?
21  A.  I work with the Department of Defense on a citizens
22       advisory committee at a U.S. Army base cleanup,
23       Natick Soldier Systems Command, where Super Fund
24       cleanup is just beginning. They're looking for
25       interested citizens from the community.

Exhibit F

12TH STORY of Level 1 printed in FULL format.

Copyright 1992 Globe Newspaper Company
The Boston Globe

September 17, 1992, Thursday, City Edition

SECTION: METRO/REGION; Pg. 39

LENGTH: 747 words

HEADLINE: Toxic level of Boston harbor has not improved, says group

BYLINE: By Scott Allen, Globe Staff

BODY:
The $ 6.1 billion Boston Harbor cleanup has made virtually no progress in reducing the amount of toxic chemicals going into the ocean, according to a report by an environmental group scheduled to be released today.

The Massachusetts Toxics Campaign report, using information from the Massachusetts Water Resources Authority, finds that 2,600 pounds of toxic chemicals enter the harbor daily, roughly the same as in 1985. That contradicts the MWRA's claim that the amount of chemicals reaching the harbor is declining.

"What they've done is remove the visible toxics, but the invisible stuff remains," said Marco Kaltofen, who did most of the research for the report.

But MWRA officials criticized the report as "scare tactics" that inappropriately lumps together dangerous chemicals with those that are barely hazardous. .

Michael Connor, the MWRA's environmental quality director, said perhaps 30 percent of the toxic chemicals in the report are boron. "Essentially, that's what you use to wash diapers with because it's relatively nontoxic," he said.

According to MWRA figures, the total amount of nine key toxic metals streaming into the harbor from the authority's two treatment plants has fallen from 1,927 pounds a day in 1985 to 648 pounds a day now.

MWRA officials acknowledge that the concentration of many other chemicals is not declining, but say most are not a major concern because they are not particularly poisonous or they are found in very low concentrations.

A Massachusetts Institute of Technology expert on organic chemicals in sewage said the Toxics Campaign report is hard to believe. Phil Gschwend noted that the authority stopped the daily dumping of sewage sludge into the harbor last year, a move that significantly reduced toxic contamination.

"Stopping the discharge of the sludge, they've got to admit that's helped," said Gschwend.

The Toxics Campaign report argues that the MWRA's court-ordered cleanup of Boston Harbor has resulted in the removal of obvious signs of pollution, such as scum and greaseballs floating on the water, but has done little to reduce the flow of poisons such as cyanide through MWRA sewers and into the harbor.

Basing his conclusion on MWRA waste-water tests for 129 federally defined hazardous chemicals, Kaltofen said there is no clear reduction in toxic chemicals going into the harbor since 1985 when the authority was formed to carry out the cleanup.

Kaltofen's statistics show that, if the MWRA had not stopped dumping sewage sludge into the ocean last December, the total amount of toxic chemicals would have been up by around 30 percent compared to 1985. However, Kaltofen said, improvements in testing techniques since 1985 could account for the higher chemical concentrations now.

"What you can say, for all that we've spent on the harbor cleanup, we haven't really made any progress," he said.

Kathleen Hearn, the MWRA official in charge of controlling industrial pollution, called that conclusion "scare tactics" from an organization that supports the unrealistic goal of zero pollution discharge by industry.

Moreover, Hearn said the MWRA's treated wastewater is well below federal safety standards for 129 toxic chemicals.

"Are we trying to put businesses out of business because they totally can't use these chemicals any more or are we looking to do what's safe?" Hearn asked.

The Massachusetts Toxics Campaign and the authority have clashed for years over how to manage - and even measure - industrial pollution of Boston Harbor. Although Hearn's department has fined companies more than $ 5 million for illegal chemical dumping, the Toxics Campaign believes the legal limits are too lax. Most of the pollution described in "The Boston Harbor Toxics Project" was legal.

The report found that Polaroid in Waltham was the single top legal polluter, discharging 8,079 pounds of chemicals a year into the MWRA sewer system. That was an increase of more than 1,000 pounds from the last campaign report in 1989.

"I support everybody's effort to clean up the harbor, but we need to be fair about how we characterize" pollution levels, said Harry Fatkin, Polaroid's director of health, safety and environmental affairs.

He said Polaroid's discharges into the sewer have declined substantially since 1988 when the corporation adopted a chemical use reduction program. Polaroid officials said the company's actual toxic discharge this year has been significantly less than 1,000 pounds.

LANGUAGE: ENGLISH

LOAD-DATE: September 18, 1992

Exhibit G

No. 90/NJ/5076

IN THE HIGH COURT OF JUSTICE
QUEEN'S BENCH DIVISION

Royal Courts of Justice,
The Strand, London WC2

Thursday, 24th October, 1991

Before

MR JUSTICE MACPHERSON

--------------------

LORRAINE TAYLOR

Plaintiff

v

AIRPORT TRANSPORT AND WAREHOUSE SERVICES LIMITED

Defendants

--------------------

MR M. CURWEN   (instructed by Messrs. Osmond Gaunt & Rose)
    appeared for the Plaintiff

MR R HONE (instructed by J T Flanagan) appeared for the
    Defendants

--------------------

Transcript of the Official Tape Recording by
Harry Counsell & Co., 61 Carey Street, London. WC2A.2JG
Telephone: 071-242 9346

--------------------

JUDGMENT
(As Approved)

--------------------

1

MR JUSTICE MACPHERSON:   The plaintiff, Mrs Lorraine Taylor,
worked for the defendants, Airport Transport and
Warehouse Services Limited in 1984. She drove Mercedes 2
ton and other trucks. I have no doubt but that she
enjoyed her work and was good at it. I am not convinced
that it is probable that she would have gained an HGV
licence later on, that was a possibility but in my
judgment no more than that.

In any event it is rightly and sensibly accepted by
the plaintiff that upon all the evidence she might well
have had to stop work by about the end of 1991 because of
increasing osteo-arthritis from which, unfortunately, she
suffers. It is not crippling yet, and I hope very much
that it never will be. But, Mr Curwen has accepted that
no loss of earnings can possibly be claimed beyond 1991.
Less active work may well be possible, I believe, should
the plaintiff wish to undertake it.

The plaintiff does, however, contend that she should
be awarded special damages, loss of earnings only,
amounting to a sum of about £30,000 and general damages
in addition against her ex-employers. She says that those
damages flow from the results of exposure to the fumes of
a chemical called allylcaproate which happened on two
consecutive days, 22nd and 23rd November, 1984.

On the first day the plaintiff told me that between
about 1 pm and the end of her shift, she detected a
chemical smell and saw that a 5 gallon drum of that
chemical had leaked and soaked the back of her truck and
some of the parcels in it. The result, says the
plaintiff, was that because of the chemical fumes she

2

thought that she was getting flu. Her nose ran, her eyes watered, she coughed and sneezed.

A

On the 23rd of November, the plaintiff was better, but although she was told that the truck had been washed she again developed the symptoms described. She says that her face swelled and that her eyes were swollen. She went

B to hospital with her sons, and pads and bandages were applied to both eyes. Twenty four hours later she had some blurred vision and a headache and a runny nose, and she was coughing.

C

On the 26th November, the plaintiff went to her family Doctor, Doctor Vald. Her actual complaint is recorded as being: "blurred vision, right eye, and feels dizzy". From then onwards the surgery provided her with

D regular medical certificates for "chemical injury to both eyes". These certificates went on apparently, even after the plaintiff went to see Doctor Jean Monro on 17th September, 1985. Up to that date, and afterwards, there

E were many visits to the surgery but, for example, in April and May 1985 when she stopped work, the records do not show that the plaintiff was complaining about

F anything specific other than continuing eye trouble.

It is of great significance also that on 22nd January, 1985 the plaintiff went to Hillingdon Hospital complaining only of soreness in both eyes (F, page 60)

G and asserting that her general health was satisfactory.

In evidence, the plaintiff did at one stage say that her universal aches and pains began by January, 1985. This was plainly wrong. It may be that the plaintiff

H simply made a mistake about the date of the onset of her

3

A

B

C

D

E

F

G

H

general malaise. The report of Dr. Sousson to which I
have referred is important in this regard. On 20th May,
and 28th July, 1985 the plaintiff was at Ealing Hospital
complaining of headaches. She was described in May as "a
pleasant, fit looking lady". Both reports indicate that
the headaches were caused by tension or anxiety. The
neurological registrar, (F. page 56) said in July, that
"the exposure to the chemical had not left her with
residual damage".

For good measure the plaintiff also went to
Moorfields Hospital where she was told that there was
nothing wrong with her eyes. Her visit to the hospital
was on 29th January, 1985 and the relevant report is
dated 27th February.

I am convinced, therefore, that the multiple
complaints and symptoms which appear to have developed in
this case were simply not present until about September,
1985 at the earliest. Whether they were all present then
is doubtful. Certainly, no joint or muscular aching is
proved to have occurred in the nine months after exposure
to the chemical.

Yet, on the 17th September, the plaintiff was
relating to Dr. Jean Monro that almost every part of her
body was in some way adversely affected. This appears
from Dr. Monro's first report, 6th December, 1985 (C
pages 6 - 8). I do not list the complaints, but I note
that they include such things as itching scalp, abdominal
cramp, constipation and forgetfulness, none of which has
ever been mentioned in evidence in this case.

4

A

From then onwards the plaintiff was in the hands of
Dr. Monro. Her reports and documents are in the bundle
for all to see. Mr Curwen courteously asked me not to say
more than is necessary about Dr. Monro and her activity
in the case. I will heed that request. It seems to me
that all that I need do is to say that I wholly reject Dr
Monro's evidence, opinion and diagnosis.

B

She says, in essence, and without in my judgment any
reasonable or logical scientific or medical support that
the plaintiff became chemically sensitised by her
exposure in November, 1984. Her view is that the
plaintiff's body and system has become hypersensitive to
petrochemical fumes, and that she now suffers from
multiple chemical sensitivity which is the root of all
her troubles.

C

D

By contrast, Dr. D J Pearson of the Wittington
Hospital, Manchester delivers what is in my judgment a
devastating critique of Dr. Monro's report and evidence.
He is supported by the careful and impressive evidence of
Dr. Lesley Bidstrup. I accept the evidence of those two
Doctors. The effect of the evidence is that there is no
scientific basis for Dr.Monro's conclusions as to the
"spreading phenomenon" of chemical sensitization, and
furthermore that upon all the reports and examinations of
all the Doctors in the case including, of course, the
1985 reports to which I have referred, the plaintiff does
not suffer from anything physical which can possibly be
attributed to the 1984 incident.

E

F

G

Mr Curwen asks me to note the tests carried out by
Dr. Monro, particularly the 1985 test. But I feel bound

H

5

A

B

C

D

E

F

G

H

to say that the single undated sheet which is said to be
evidence of that test is most unsatisfactory.

It is plainly not a double blind test. All that it
seems to record are some vague comments probably made by
the patient herself.

Dr. Pearson's evidence about those tests seems to me
to demolish anything that Dr. Monro said about them. The
ESR test furthermore shows, as Dr. Bidstrup said, no more
than might be expected in a lady of the plaintiff's age.
The Texas blood analysis is similarly, in my judgment, of
very little significance as both Dr. Pearson and Bidstrup
testify.

The lymphocyte test referred to by Dr. Monro in one
of her Reports is negative. It seems to me unfortunate
that the phrasing of the relevant report suggests to the
outside observer that there might be some significance in
that test in favour of Dr. Monro's thesis.

Dr. Monro may be a prophet before her time. But in
my judgment her evidence was in many respects bizarre and
unscientific. Her qualifications are basic. Her business
seems to be unacceptable to the vast majority of Doctors,
and to the Insurance Houses. And her methods and
treatment have no parallel or place in the National
Health Service routines. I feel that I should say no
more.

In my judgment the basic case put forward by Dr.
Monro fails. It is the plaintiff's great misfortune that
in 1985 and then again after a prolonged gap in 1989 and
1990 she came to be encouraged to believe that she is
sensitised. I fervently hope that the end of this case

6

will enable her, perhaps with experienced and appropriate medical or psychiatric help, markedly to improve and to realise that aftershave, perfume, car fumes and the other experiences which she has been led to believe cause her harm, can be endured by her as much as by other people.

The other Doctors called by the plaintiff do not in my judgment advance her original case at all. Dr Reid, a psychiatrist, believed that the plaintiff's troubles stemmed from the accident. But he did not see the plaintiff until September, 1991. I accept from him that the plaintiff is now demoralised, tired and unwell. But, I cannot accept the direct connection which he seeks to make between the plaintiff's troubles and her accident. Partly, he based his views on the absence of anything else which caused her to have her symptoms. But he did not even know of the findings of Hillingdon and Moorfields Hospitals, and I cannot accept that Dr. Reid's opinion - impressive as he is as a Doctor - was based on much more than a belief that the symptoms came soon after the accident and must have been connected with it. I find no such connection proved, and will refer again to this later.

Dr. Price, an orthopaedic specialist, considered the plaintiff's joint pains.  But again his opinion namely, that the joint pains could stem from the toxic inhalation, was based on the early development of joint troubles. He said that he could not exclude from his mind the fact that the plaintiff was working full time, and that she then had the chemical accident with trouble to

7

her eyes and skin and then had joint trouble, <u>two to three weeks later</u>.

"The cause of the trouble could", he said, "have been swelling which would and could affect the joints". But upon the evidence there is no suggestion at all that the joint trouble developed two to three weeks after the incident, so that I am unable to accept any connection such as Dr. Price proposed to me.

That is not quite the end of the case, because after all the evidence on both sides was complete, Mr Curwen was given leave to amend the plaintiff's Statement of Claim. Partly I believe that Mr Curwen latched on to some musings of my own, and partly he attaches his new argument to the evidence of the defence Doctors. Both show good tactical thinking by an able advocate but neither in my judgment avails the plaintiff.

Mr Curwen has a twofold argument. He says that both Dr. Pearson and Dr. Bidstrup accept that the plaintiff is genuinely unwell now, and that severe anxiety or neurosis has caused her troubles, and that she should be able to succeed by establishing a causal connection between the events of 1984 and the present state of her health. She says that there has been established a material contribution which is more than coincidental between the toxic episode and the decline of her health, or that episode can otherwise be described as having triggered her whole series of problems.

Mr Curwen argues that it was reasonably foreseeable that an anxious employee like the plaintiff might well suffer upon the eggshell skull or eggshell personality

8

A

principle. I am unable to accept that any such connection
is proved. Dr.Bidstrup certainly did not support such a
connection, pointing again at the repeated hospital
reports which told the plaintiff that she was, in fact,
well. It is true that Dr. Bidzdrum produced no
alternative single cause or trigger for the plaintiff's

B

ills, but it is simply not incumbent upon the defence to
do that.

        The fact is, as the Doctors said, that the plaintiff
was, by 1984, shown to be susceptible to a variety of

C

ills, for example, hayfever or rhinitis as near to the
incident as June, 1984. Migrainous headaches, more than
once, in recent history.  Some trouble with arthritis in
the ankles, and some trouble in the fingers.  Diplopia,

D

headaches and giddiness also at an earlier date. And the



A

B

C

D

E

F

G

H

My conclusion then is that by September 1985 there were a number of disconnected and natural ills such as headaches, some degree of arthritis, perhaps some hayfever or rhinitis as to build up in the plaintiff's mind anxiety which was in fact not truly connected at all with the accident. Thereafter the wrong conclusion reached by Dr. Monro compounded those troubles. But none of that can, in my judgment, properly be proved, certainly not upon a balance of probability, to stem from the toxic accident.

The plaintiff bears the burden of proving her case. I find no causal connection established, and in some ways it would be strange that such a case should succeed when it arose so very late and is in truth a denial of the whole of the original case and its medical, or quasi medical basis.

Next, I should say that I am truly sorry for this plaintiff. That may be cold comfort to her, because she will recover nothing in the end by way of money. I formed generally a good opinion of her as a person. I am sure that she was once a hard working and reasonably happy woman. She is intelligent and alert as all her answers showed.

I do find, however, that she has considerably exaggerated her symptoms. For example, she told me that in 1984 and onwards, she used 700 tissues per week for her runny nose. She used somewhat "over the top" phrases to describe her pains and aches. I am not at all convinced that her lifestyle is, or certainly needs to be, as bad as she makes it out to be. I am sceptical

10

about those and other aspects of her own description of her ills and their effects.

A  Mr Ritchie, and the plaintiff's son, seem to me not to paint nearly such a black picture. My hope is that once this case is over much will improve. Much of her exaggeration may not be her fault.

B  Mr Hone did cross-examine the plaintiff firmly, and he did accuse her of gold-digging and even a measure of fabrication. I do not find that she wilfully invented her symptoms. I believe that she was to some extent affected

C by her wish to succeed against her ex-employees. And I fear also that the wholly misplaced inflation of her claim made Mr Hone's cross-examination inevitable. I refer here to the evidence of Mrs Gillian Talbot, a

D representative of the "Personal and Medical Claims Service". That witness produced a report dated the 26th February, 1991 (E page 44) which grossly inflated the plaintiff's claim without any sensible basis at all.

E  After visiting the plaintiff at home, Mrs Talbot proceeded to suggest that the plaintiff needed home help and gardening help, to the tune of nearly £50,000 over

F the next 15 years. She also saw fit to suggest that the defendants should pay for extra heating, clothes, an orthopaedic bed - (£2,000), and the whole cost of an automatic car. To the plaintiff's credit she did not

G support these claims in her evidence at all. They never should have been made. My own view which perhaps may be shared by others, is that this is not expert evidence at all. The Courts should be wary of such constructed

H claims.

11

In some cases, of course, nursing expert evidence and other special evidence is helpful. The evidence of Mrs Talbot served, in my judgment, only to make the plaintiff believe that she might recover a quarter of a million pounds and to lay her open to firm cross-examination. Such evidence is harmful to a plaintiff's case and counter productive.

Finally then, I turn to the assessment of damages for the comparatively slight eye trouble, associated perhaps with a degree of swelling and some headache which exposure to this chemical did cause. Liability was admitted to this extent.

Given that the family Doctor did to some extent encourage the plaintiff to believe that her eyes were worse than they were by giving out sick notes rather like confetti, I cannot find that her actual eye trouble can be said to have lasted longer than a few months at the outside. That is probably a generous view.

In all the circumstances £1,000 for the whole episode is the most to which the plaintiff is, in my judgment, entitled. After all, Moorfields Hospital cleared the plaintiff finally by the 25th January in respect of eye difficulties.

Mr Curwen has said all that can be said in this case in difficult circumstances. I am grateful to all concerned for their help in reaching my decision. There will be judgment for the plaintiff for £1,000.

MR CURWEN: My Lord, there are certain consequences. The first matter is money in Court, and indeed paid to the plaintiff on account. The position is this, that on 13th January, 1986 she was given £1,500 on account, which of course will more than cover her damages. Then it is right

to say that there was a payment into Court of £6,000
which was made sometime ago---

A

MR   HONE: 26th September, 1989.

MR   CURWEN: That is right, 26th September, 1989. I do not
think that adds anything to the question of what she is
going to get, it simply means it has got to come out of
Court to the defendants. My Lord, it is a matter of some
regret that on Tuesday of last week a further sum of
£12,500 was paid into Court. It is a matter of

B   considerable regret to me that Mrs Taylor did not accept
that sum of money, and on Monday when this trial started
it ceased to be on offer.

My Lord, both matters your Lordship will appreciate,
have some relevance to the observations your Lordship has
already made about how a plaintiff can be influenced. I
say no more about that except to express my own regret.

C

I go on to the matter of costs. This lady has a
legal aid certificate. She has a contribution of £58 and
that is all, so that, I think the position so far as
costs is this: that on the 13th January, 1986 she
received more than she has recovered inclusive of
interest, and therefore I think it is right she should
have her costs up to the 13th January, 1986, but there

D   does not seem to be any argument at all that she should
have her costs after that date.

MR   JUSTICE MACPHERSON: Well, that would only mean that the
case was worth £1,500 and I do not think ordinarily I
would make an Order in favour of a plaintiff in the High
Court who recovered that amount. It seems to me there
should be no Order as to costs up to that date, and that

E   the defendants should have their costs thereafter, but
that Order not to be enforced without the leave of this
Court or the Court of Appeal. That must be right, must it
not, Mr Hone?

MR   HONE: My Lord, of course, I could try to go further, but
my instructing solicitors and I know my principals behind

F   my instructing solicitors do not seek to turn the screw
to the ultimate degree and in those circumstances your
Lordship's Order would be appropriate.

MR   JUSTICE MACPHERSON:  That would be appropriate, yes.

MR   CURWEN: Well, I wonder if I am not entitled to, at least,
County Court scale costs up to the 13th January?

G

MR   JUSTICE MACPHERSON:  In protection of the Legal Aid Fund?

MR   CURWEN: My Lord, that is what I had in mind. It is not
going to recover a great deal of money from her, if
anything, and my Lord, I simply do what I can for the
Fund.

H

13

**MR**    JUSTICE MACPHERSON: Yes, thank you, Mr Curwen. You have said that you can. No, the Order will be that there be no Order for costs up to the date of the payment in, thereafter the defendants will have all their costs. That Order has to be made against the plaintiff, it can be made against nobody else, but that Order will not be enforced without the leave of this Court or the Court of Appeal. All the monies which have been paid into Court will be paid out including any interest accrued, to the defendants' solicitors without further Order. Thank you very much.

**MR**    CURWEN: May we have legal aid taxation?

**MR**    JUSTICE MACPHERSON: Yes.

**MR**    CURWEN: May I trouble your Lordship with one other matter? During the course of the case your Lordship will remember that a file of original documents was produced by Dr Jean Monro at the request of the defendants, and that file was handed over to my learned friend, on the usual undertaking that it should come back. My Lord, it is not his fault, I say straight away, I am sure, but the problem is that the file has not come back.

**MR**    JUSTICE MACPHERSON: I thought it went back to her in the witness box and that she took it away. Well, Mr Hone, I am sure with his solicitor - I do not need---

**MR**    HONE: We have been very concerned about this because the last thing I wanted was any suggestion of suspicion of collaborating with anybody.

**MR**    JUSTICE MACPHERSON: Where is it now?

**MR**    HONE: My Lord, we do not know. We looked everywhere, we even sent a representative down to the lost property office in the Courts. I was cross-examining from this table with the second latex rheumatoid arthritis report, yesterday morning.

**MR**    JUSTICE MACPHERSON: Yes, you were but then you handed it back. You handed it back to her so that she could see it. My evidence may be suspect, I am not under Oath, but I would say that you handed it back to her, and then I asked her whether she had got it and told her she could take it away.

**MR**    HONE: I had forgotten that, I have to admit.

**MR**    JUSTICE MACPHERSON: Do you remember that, Mr Curwen?

**MR**    CURWEN: My Lord, all I can say is that she complained to me that she had not got it, and the suggestion was, I suppose, was that someone on the other side, not my learned friend or his solicitors, but somebody on the other side---

14

**MR**    JUSTICE MACPHERSON: Mr Brown reminds me that one of the last things I said to her was "do not forget to take your file with you" because she had got it there with her in the witness box. You can check that on the tape, if you want to downstairs, and see if my evidence would be any good in Court. I think that is right. I think she must recheck that. Of course, at the same time. if it turns up anywhere else, everyone will agree that it must be returned to her. I am not sure it would be much help to anybody, but that is another matter.

---------------------

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served a copy of the within and foregoing

**DEFENDANT GEORGIA-PACIFIC CORPORATION'S OBJECTION TO THE**

**AFFIDAVIT OF MARCO KALTOFEN, P.E. IN SUPPORT OF PLAINTIFFS' MOTION**

**TO REMAND** upon all parties to this matter by depositing a true copy of same in the U. S.

Mail, proper postage prepaid, addressed to counsel of record as follows:

Robert E. Shields, Esq.
DOFFERMYRE, SHIELDS, CANFIELD &
    KNOWLES
1355 Peachtree Street,
Suite 1600
Atlanta, Georgia 30309

Robert C. Hilliard, Esq.
Russel W. Heald, Esq.
HILLIARD & HEALD
The Petroleum Building
5550 Fannin, Suite 111
Beaumont, Texas 77701

Grover Hankins, Esq.
Texas Southern University
Thurgood Marshall School of Law
310 Cleburne Avenue
Houston, Texas 77004

J Kevin Buster, Esq.
KING & SPALDING
191 Peachtree Street
Atlanta, Georgia 30303

This 23rd day of September, 1998.

W. RAY PERSONS